**FILED UNDER SEAL**[1]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:[1] | Chapter 11 |
| THE STANDARD REGISTER COMPANY, *et al*,[2] | Case No.  15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| EISNERAMPER LLP, NOT IN ITS INDIVIDUAL CAPACITY BUT AS TRUSTEE OF THE SRC LIQUIDATING GUC TRUST, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 15-50771 (BLS) |
| JOSEPH P. MORGAN, JR., ROY W. BEGLEY, JR., F. DAVID CLARKE, III, JOHN Q. SHERMAN, II, JULIE D. KLAPSTEIN, JOHN J. SCHIFF, JR., ROBERT M. GINNAN, R. ERIC MCCARTHEY, JOHN DOES 1-10, AND XYZ COMPANIES 1-10, | **AMENDED ADVERSARY COMPLAINT** |
| Defendants. | |

EisnerAmper LLP, not in its individual capacity but solely as trustee (the "Trustee") of

the SRC Liquidating GUC Trust (the "Trust"), as and for its amended adversary complaint (the

"Amended Complaint") against the above-captioned defendants (collectively, the "Defendants")

pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

§§ 105, 502(d), 544, 548, 550, and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et*

---

[1]   The Trustee filed this Amended Complaint under seal, and a redacted copy of this Amended Complaint on the public docket, pursuant to the *Order Authorizing the Committee to File Under Seal the Motion (Including Any Exhibits Attached Thereto) of the Official Committee of Unsecured Creditors for an Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* [D.I. 612].

[2]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: The Standard Register Company (5440); Standard Register Holding Company (3186); Standard Register Technologies, Inc. (3180); Standard Register International, Inc. (1861); iMedConsent, LLC (6337); Standard Register of Puerto Rico Inc. (0578); Standard Register Mexico Holding Company (1624); Standard Register Holding, S. de R.L. de C.V. (4GR4); Standard Register de México, S. de R.L. de C.V. (4FN0); Standard Register Servicios, S. de R.L. de C.V. (43K5); and Standard Register Technologies Canada ULC (0001). The headquarters for the above-captioned Debtors is located at 600 Albany Street, Dayton, Ohio 45417.

*seq.* (the "Bankruptcy Code"), and Ohio Rev. Code § 1336.04(A)(2), hereby respectfully alleges as follows:

## PRELIMINARY STATEMENT [3]

1.       Through this adversary proceeding, the Trustee seeks (among other relief) (a) to recover damages from the Debtors' board of directors and certain key officers for the breach of their fiduciary duties in approving Standard Register's wasteful WorkflowOne Acquisition, (b) to recover transaction bonuses paid to two of Standard Register's key insiders in connection with the WorkflowOne Acquisition, and (c) to disallow the alleged claims of the insiders who received transaction bonuses.  The relief the Trustee seeks through this adversary proceeding will provide meaningful financial recoveries for the Debtors' general unsecured creditors on account of the financial harm the WorkflowOne Acquisition inflicted on them.

## JURISDICTION, VENUE, AND STANDING

2.       The Official Committee of Unsecured Creditors (the "Committee") of The Standard Register Company ("SRC") and the other debtors-in-possession (collectively with SRC, the "Debtors") in the above-captioned chapter 11 bankruptcy cases (the "Chapter 11 Cases") commenced this adversary proceeding (the "Adversary Proceeding") on June 8, 2015.

3.       The Committee had standing to bring this Adversary Proceeding pursuant to the *Order Granting the Committee Standing and Authorizing the Committee to Commence and Prosecute Certain Actions on Behalf of the Debtors' Estates* [D.I. 648].[4]

4.       On July 31, 2015, pursuant to (a) the *Order (I) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of all Liens, Claims, Encumbrances, and*

---

[3]    Capitalized terms in the Preliminary Statement have the meanings ascribed thereto in subsequent sections of the Amended Complaint.

[4]    Citations to [D.I. __] refer to entries on the docket in the Chapter 11 Cases.
        Citations to [Adv. D.I. __] refer to entries on the docket in this Adversary Proceeding.

*Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Certain Related Relief* (the "Sale Order") [D.I. 698], (b) the *Settlement Agreement Among Debtors, Silver Point Finance, LLC & Official Committee of Unsecured Creditors* (the "Settlement Agreement") [D.I. 696 Ex. A] approved in the Sale Order, and (c) the *Standard Register Company General Unsecured Creditors' GUC Trust Agreement* (the "Trust Agreement") [D.I. 888 Ex. A], the Debtors transferred all of the claims and causes of action the Committee asserted in this Adversary Proceeding (the "Claims") to the Trustee in trust for the beneficiaries of the Trust, and the Debtors' secured lenders released their liens on and security interests in the Claims and the proceeds thereof.

5.      The Trustee has replaced the Committee as plaintiff in this Adversary Proceeding pursuant to the *Order Substituting Plaintiff* entered on August 3, 2015 (the "Substitution Order") [Adv. D.I. 5].

6.      On March 12, 2015 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary bankruptcy petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court").  The Chapter 11 Cases are jointly administered under the case styled as In re The Standard Register Company, Lead Case No. 15-10541 (BLS), pursuant to an order of the Court dated March 13, 2015 [D.I. 46].

7.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334(b) and the Standing Order of the United States District Court for the District of Delaware referring all cases and proceedings arising under the Bankruptcy Code to the Bankruptcy Judges of this District.

8.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). In the event any part of this adversary proceeding is found to be non-core, the Trustee consents to the entry of final orders and judgments by this Court pursuant to Bankruptcy Rule 7008.

9.      Venue is proper in this Court and this District pursuant to 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with the Chapter 11 Cases currently pending before the Court.

## THE PARTIES

10.      Plaintiff is the trustee of the SRC Liquidating GUC Trust created pursuant to the Settlement Agreement, the Trust Agreement, and the Sale Order.

### Director and Officer Defendants

11.      Joseph P. Morgan, Jr. ("Morgan") was, at all times relevant to this Amended Complaint, the Debtors' President and Chief Executive Officer and a member of the Debtors' Board of Directors (the "Board").  Morgan was a member of the Board from 2009 until he resigned in 2015 and was a member of the Executive Committee.

12.      Roy W. Begley, Jr. ("Begley") was, at all times relevant to this Amended Complaint, a member of the Board.  Begley resigned from the Board on March 10, 2015.

13.      F. David Clarke, III ("Clarke") is, and was at all times relevant to this Amended Complaint, a member of the Board.  Clarke has been a member of the Board since 1992 and Chairman of the Board since 2006.  Clarke is also the Chair of the Executive Committee and a member of the Compensation Committee and the Audit Committee.

14.      John Q. Sherman, II ("Sherman") is, and was at all times relevant to this Amended Complaint, a member of the Board.  Sherman has been a member of the Board since 1994 and is the Chair of the Corporate Governance and Nominating Committee, a member of the

Compensation Committee, and the Presiding Director of Standard Register's non-management director meeting.[5]

15.    Julie D. Klapstein ("Klapstein") was, at all times relevant to this Amended Complaint, a member of the Board.  Klapstein was elected to the Board in April 2011 and, according to the November 5, 2014 Board minutes, resigned from the Board on November 3, 2014.

16.    John J. Schiff, Jr. ("Schiff") is, and was at all times relevant to this Amended Complaint, a member of the Board.  Schiff has been a member of the Board since 1982 and is a member of the Audit Committee.

17.    R. Eric McCarthey (collectively with Morgan, Begley, Clarke, Sherman, Klapstein, and Schiff, the "Director Defendants") has been a member of the Board since 2008 and is the Chair of the Audit Committee and a member of the Executive and Corporate Governance Committee and the Nominating Committee.

18.    Robert M. Ginnan ("Ginnan" and together with the Director Defendants, the "Director and Officer Defendants") was the Debtors' chief financial officer prior to Standard Register's August 1, 2013 acquisition (as described more fully below, the "WorkflowOne Acquisition") of 100% of the membership interests in WorkflowOne, LLC and its direct and indirect subsidiaries (collectively, "WorkflowOne") from WFSR Holdings, LLC, f/k/a Workflow Holdings, LLC ("WF Holdings").  Ginnan prepared financial projections and other information for the Board and its advisors in support of the WorkflowOne Acquisition.  Ginnan resigned on February 24, 2015, effective as of March 6, 2015.

---

[5]    As used herein, "Standard Register" refers to the Debtors and their business as they existed prior to the WorkflowOne Acquisition (as defined below).

**Other Defendants**

19.     John Does 1-10 and XYZ Companies 1-10 (the "<u>Additional Parties</u>") are persons and legal entities (including without limitation consultants, law firms, accounting firms, and/or financial advisory firms) that aided and abetted, benefitted from, or otherwise participated in the wrongful acts alleged in this Amended Complaint.  The Trustee will ascertain the identity of the Additional Parties through discovery in this adversary proceeding.

## BACKGROUND

**A.      History of the Debtors' Businesses**

20.     The Standard Register Company was founded in 1912 in Dayton, Ohio.  Standard Register's first product, the pin-feed autographic register, revolutionized business forms by using a wooden sprocket to feed rolled, pre-punched forms through the hand-cranked machine, thereby keeping the layers of paper and carbon from slipping.

21.     Standard Register went public in 1956.  In 1986, Standard Register acquired Burroughs Corporation, becoming the second-largest business forms manufacturer in the world.

22.     In 1996, Standard Register's stock moved from the NASDAQ and began trading on the New York Stock Exchange, where it was traded until the Debtors filed for bankruptcy protection on the Petition Date.

23.     According to the Debtors, they are one of the leading providers in the United States of communications services and communications workflow, content and analytics solutions through multiple communication channels, including print, electronic, and internet-based communications, to clients in the healthcare, financial services, manufacturing, retail, and transportation industries.

24.     The Debtors' operations are divided between two main business units: (a) healthcare, which accounts for almost one-third of the Debtors' revenues, and (b) integrated communications (f/k/a business solutions), which accounts for the remainder of the Debtors' revenues.

**B.      History of WorkflowOne**

25.     Prior to the WorkflowOne Acquisition, WorkflowOne was a commercial printer and a competitor of Standard Register.

26.     Prior to 2009, twenty of the Workflow Debtors (as defined below) were borrowers and/or guarantors under two secured credit facilities (in addition to other indebtedness):  (a) a first-lien credit facility with approximately $111.5 million of term loan principal and $35 million of revolving credit advances (including $4.8 million of letters of credit) outstanding (the "Workflow First-Lien Facility") and (b) a $140 million second-lien term loan bearing interest at 18% per annum, with approximately $56.5 million of accrued paid-in-kind interest outstanding (the "Workflow Second-Lien Loan" and together with the Workflow First-Lien Facility, the "Workflow Secured Loans").

27.     During the fourth quarter of 2008, the Workflow Debtors were unable to make the substantial interest payments due under the Workflow First-Lien Facility.

28.     In January 2009, the Workflow Debtors entered into forbearance agreements with respect to the Workflow Secured Loans.

29.     Under the terms of the forbearance agreements, interest on the Workflow Second-Lien Loan was capitalized.

30.     Shortly thereafter, Silver Point Finance, LLC ("Silver Point Finance"), an affiliate of Silver Point Capital, L.P. (together with its affiliates, "Silver Point") replaced Credit Suisse as agent under the Workflow Second-Lien Loan.

31.     In the second quarter of 2009, the Workflow Debtors entered into amendments to the Workflow Secured Loans, obtaining short-term covenant relief.

32.     In late 2009, the Workflow Debtors sought to undertake a high-yield bond issuance to pay off the Workflow First-Lien Facility and a portion of the Workflow Second-Lien Loan.

33.     The Workflow Debtors could not obtain the consent of certain lenders under the Workflow Secured Loans, whose consent was necessary to undertake the transaction due to their controlling position.

34.     In the spring of 2010, the Workflow Debtors sought and reached an agreement with certain of their first-lien lenders to extend the maturity date of the first tranche of their first-lien revolver, but the sole lender under the second tranche refused to extend the maturity of the second tranche.

35.     As a result, on September 29, 2010, Workflow Management Inc. and twenty (20) of its direct and indirect subsidiaries (collectively, the "Workflow Debtors") filed chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of Virginia.

36.     The Workflow Debtors' chapter 11 plan of reorganization (the "Workflow Plan") was confirmed by order dated February 25, 2011.

37.     Through the Workflow Plan, WF Holdings purchased all of the assets of the Workflow Debtors pursuant to section 363 of the Bankruptcy Code.

38.     Through the Workflow Plan, the Workflow Secured Loans were converted into first- and second-lien notes issued by WF Holdings (the "New Workflow First-Lien Loan" and "New Workflow Second-Lien Loan", respectively, and collectively, the "New Workflow Loans") and secured by first and second liens on the assets WF Holdings acquired.

C.     **Standard Register's Pre-Acquisition Capital Structure and Operations**

39.     Prior to the WorkflowOne Acquisition, Standard Register had very little interest-bearing debt.  Although Standard Register's defined benefit pension plan was underfunded, its capital structure was manageable and it was able to pay its debts as they became due.

40.     Immediately before the WorkflowOne Acquisition closed on August 1, 2013, Standard Register's only funded long-term debt consisted of outstanding borrowings of approximately $50 million under a $100 million asset-backed revolving credit facility (the "Prepetition ABL Facility") with Bank of America, N.A. as agent and lender and Wells Fargo Bank, N.A. as lender.

41.     SRC was the borrower and four of its subsidiaries, Standard Register International, Inc., Standard Register Technologies, Inc., iMedconsent, LLC, and Standard Register of Puerto Rico Inc.[6] (collectively with SRC, the "Prepetition Obligor Debtors"), were guarantors under the Prepetition ABL Facility.

42.     Prior to the WorkflowOne Acquisition, the Prepetition ABL Facility was secured by a lien on the Prepetition Obligor Debtors' accounts receivable, inventories, fixed assets, and certain other assets.

---

[6]     On June 10, 2014, WorkflowOne of Puerto Rico Inc. changed its name to Standard Register of Puerto Rico Inc. WorkflowOne, LLC was also a guarantor under the Prepetition ABL Facility until it merged into SRC on December 31, 2014.

43.     Other than the Prepetition Obligor Debtors, no other Debtors or affiliates of the Debtors were borrowers or obligors under the Prepetition ABL Facility.[7]

44.     According to Standard Register's Form 10-Q for the first quarter of 2013, Standard Register had negative shareholders' equity of approximately ($121 million) as of the end of the first quarter of 2013, shortly before the closing of the WorkflowOne Acquisition.

45.     In the first half of 2013 (the two quarters preceding the WorkflowOne Acquisition), Standard Register generated approximately $8.8 million of cash flow from operations (even after paying $11.9 million of pension contributions), used $6.3 million of cash to make capital improvements, and made $1.2 million of net principal repayments on the Prepetition ABL Facility.

46.     Before making pension and other post-employment benefits contributions, Standard Register generated over $148 million of net cash flow from operations from 2010 through the first half of 2013.  In total, from 2010 through the first half of 2013, Standard Register's operations generated approximately $52.4 million of cash, even after paying $95.7 million of pension and postretirement benefit contributions, and Standard Register used $39.7 million of cash generated by operations to fund capital expenditures over the same period, as set forth below:

| ($ millions) | 2010 | 2011 | 2012 | 1H2013 | Total |
|---|---|---|---|---|---|
| Net Cash Provided By Operating Activities | $ 11.8 | $ 13.3 | $ 18.5 | $ 8.8 | $ 52.4 |
| Net Cash Used in Investing Activities | (10.5) | (17.2) | (5.8) | (6.2) | (39.7) |
| Net Cash (Used In) Provided by Financing Activities | (3.1) | 5.1 | (13.4) | (3.1) | (14.5) |
| *Effect of Exchange Rate Changes* | (0.1) | (0.2) | 0.1 | 0.0 | (0.2) |
| **Net Change in Cash** | **$ (1.9)** | **$ 1.0** | **$ (0.6)** | **$ (0.5)** | **$ (2.0)** |
| *Memo: Pension and OPEB Contributions* | *27.8* | *28.7* | *27.3* | *11.9* | *95.7* |

---

[7]     Six of the Debtors are not parties (either as borrowers or guarantors) to the Prepetition Term Loans or the Prepetition ABL Facility: Standard Register Holding Company, Standard Register Mexico Holding Company, Standard Register Holding, S. de R.L. de C.V., Standard Register de Mexico, S. de R.L. de C.V., Standard Register Servicios, S. de R.L. de C.V., Standard Register Technologies Canada ULC.

D.      **The WorkflowOne Acquisition**



51.     In deciding to move forward with the WorkflowOne Acquisition, the Board and the Director and Officer Defendants ensured that Standard Register's senior management and the Board (some of whom were descendants of Standard Register's founders) would remain in place and retain their equity holdings, and that certain members of senior management, including Morgan and Ginnan, would receive significant transaction bonuses and other incentive compensation.

52.     Significantly, Morgan and Ginnan held substantial personal interests in pursuing and consummating the WorkflowOne Acquisition by virtue of their interest in maintaining their senior officer positions and receiving significant bonuses and other compensation upon consummation of the acquisition.

53.     Due in large part to the WorkflowOne Acquisition, Morgan and Ginnan saw their total compensation more than double in 2013 as compared to 2012.

54.     Morgan's total compensation for 2013 was $4.14 million (including a $900,000 transaction bonus related to the WorkflowOne Acquisition), a 120.8% increase from his 2012 compensation of $1.87 million.

55.     Ginnan's total compensation for 2013 was $1.48 million (including a $325,000 transaction bonus related to the WorkflowOne Acquisition), a 103.4% increase from his 2012 compensation of $725,000.

56.     █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

57.     █████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

58. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████

59. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████

60. ████████████ as of the date of the WorkflowOne Acquisition, analysts forecasted an average EBITDA margin contraction of 2.25 percentage points from 2012-2015 for the top five comparable public companies. ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████████

61. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

62.     The Board and the Director and Officer Defendants nevertheless agreed to pay $218 million, including incurring $210 million of assumed debt secured by new liens on Standard Register's assets, for WorkflowOne, notwithstanding WorkflowOne's deteriorating revenues and the fact that the value of WorkflowOne was significantly and materially less than $218 million.  The midpoint of the enterprise valuation implied by applying traditional valuation methodologies to WorkflowOne is just ████████████████████████████████████ ████████████████████████

63.     As consideration for the WorkflowOne Acquisition:

- SRC paid $1.00 to WF Holdings in exchange for 100% of the equity interests in WorkflowOne,

- SRC became an additional borrower under the New Workflow First-Lien Loan, which was converted into a term loan at the closing of the WorkflowOne Acquisition (as modified, the "First-Lien Term Loan"),

- SRC became an additional borrower under the New Workflow Second-Lien Loan, which was reduced in principal amount to $86,246,740.38 (as modified, the "Second-Lien Term Loan" and together with the First-Lien Term Loan, the "Prepetition Term Loans"),

- the maturity date of the Prepetition Term Loans was amended to August 1, 2018.

- the other Prepetition Obligor Debtors became guarantors of the Prepetition Term Loans,

- Standard Register issued equity and warrants to Silver Point valued at approximately $8 million,

- SRC agreed to assume all of WorkflowOne's other liabilities, and

- all of the Prepetition Obligor Debtors granted first and second liens (the "SR Term Loan Liens" and together with the liens previously granted by WorkflowOne, the "Term Loan Liens") on certain of their assets in

support of their newly assumed obligations under the Prepetition Term Loans (the "<u>SR Term Loan Obligations</u>").

64.    By assuming the First-Lien Term Loan, the Prepetition Obligor Debtors incurred principal obligations of $123,753,259.62 at the closing of the WorkflowOne Acquisition.

65.    By assuming the Second-Lien Term Loan, the Prepetition Obligor Debtors incurred principal obligations of $86,246,740.38 at the closing of the WorkflowOne Acquisition.

66.    In total, the Prepetition Obligor Debtors incurred $210,000,000 of new SR Term Loan Obligations as of the closing of the WorkflowOne Acquisition.

67.    Through the assumption of the Prepetition Term Loans, Standard Register approximately quintupled its long-term funded debt overnight.

68.    In addition to the exorbitant principal obligations Standard Register incurred, the Prepetition Term Loans significantly limited Standard Register's financial flexibility in the face of secular headwinds and meaningful risk in implementing a financial turnaround:

- the First-Lien Term Loan required the Debtors to make principal amortization payments of $2,500,000 per quarter (prior to the WorkflowOne Acquisition, Standard Register had no ongoing principal amortization requirements because its only long-term debt was a revolving credit facility),

- the First-Lien Term Loan required the Debtors to make mandatory repayments of between 50% and 75% of their excess cash flow and the proceeds of asset sales,

- the First-Lien Term Loan bears interest at adjusted LIBOR plus 7.00%, and

- the Second-Lien Term Loan bears interest at adjusted LIBOR plus 8.65%.

69.    Due to the massive amount of debt the Debtors incurred through the WorkflowOne Acquisition, their interest expense skyrocketed.  During the first three quarters of 2014, the Debtors' interest expense was approximately $15 million, or approximately $20

million on an annualized basis, as compared to $1.2 million in the first half of 2013 (prior to the WorkflowOne Acquisition).

70.     Based on ongoing secular headwinds, significant risks to the financial projections for the combined company, and the burdens imposed by the Prepetition Term Loans, the Director and Officer Defendants should have realized that the WorkflowOne Acquisition would leave the Debtors overleveraged and posed an unjustifiable, material risk that the Debtors would not satisfy their debts as they became due, which would lead to catastrophic results for the Debtors and all of their stakeholders, including, but not limited to, the Debtors' unsecured creditors.

71.     ████████████████████████████████

████████████████████████████████████

███████████████████    ███████████████

███████████████████

72.     ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

73.     From 2010 through the first half of 2013 (immediately before the WorkflowOne Acquisition), the Debtors paid approximately $96 million of pension contributions.  As of June 30, 2013, Standard Register's unfunded pension benefit liability was approximately $239 million.

74.     ████████████████████████████████

████████████████████████████████████

75. ████████████████████████████████████████████

76. ████████████████████████████████████████████

| ($ millions) | | | | |
|---|---|---|---|---|
| ████████ | ████ | ██ | ████ | ██ |
| ████████ | | ██ | | ██ |
| ████ | | ██ | ██ | ██ |

77. ████████████████████████████████████████████

78. ████████████████████████████████████████████

79. ████████████████████████████████████████████

80. ███████████████████████████████████████

███████████████████████████████████████

███████████████████

81.     The midpoint fair value of WorkflowOne at the time of the WorkflowOne Acquisition (based on traditional valuation methodologies ██████████████████ ███████████████████ and cost synergies and related expenses) was approximately ███ ████, significantly and materially less than the $218 million purchase price.

82.     Because the value of WorkflowOne was significantly and materially less than (a) the amount of the SR Term Loan Obligations incurred by the Prepetition Obligor Debtors and (b) the value of the SR Term Loan Liens granted by the Prepetition Obligor Debtors, the Prepetition Obligor Debtors did not receive reasonably equivalent value for the incurrence of the SR Term Loan Obligations or the granting of the SR Term Loan Liens.

83.     On January 23, 2012, Standard Register announced that it was suspending quarterly dividends pursuant to Ohio law, which requires that cash dividends be paid only out of a corporation's statutory surplus.  Because Standard Register's shareholders' equity had turned negative, there was no longer a surplus from which to pay dividends.

84.     Immediately following the WorkflowOne Acquisition, the Debtors' liabilities exceeded the fair value of their assets.

85.     At the time of the WorkflowOne Acquisition, the pro forma combined company had approximately $261 million of funded debt obligations, $7 million of capital lease obligations, $235 million of unfunded pension liability, $3 million of deferred compensation obligations, and $4 million of reported environmental liabilities, for combined total debt and non-operating liabilities of $511 million.

86.     Following the WorkflowOne Acquisition, the Debtors' total debt and non-operating liabilities of $511 million exceeded the midpoint fair value of their assets (based on a comparable companies analysis, comparable transactions analysis, discounted cash flow analysis including synergies, and including net operating losses) by approximately $218 million.

87.     Therefore, the Debtors were left insolvent as a result of the WorkflowOne Acquisition.

88.     Following the WorkflowOne Acquisition, the Debtors had total adjusted debt and non-operating liabilities of ██ times projected pro forma combined 2013 EBITDAP[8] and ██ times projected 2014 EBITDAP.   Under any of the traditional valuation methodologies, this exceeds the implied valuation range for the Debtors.

89.     In contrast, comparable companies[9] had a median total adjusted debt of just 1.9 times estimated 2013 EBITDAP.

90.     The Debtors' severe undercapitalization was reflected in their leverage ratio and in comparison to their peers.  Following the WorkflowOne Acquisition, the ratio of Standard Register's total liabilities-to-capitalization was 147%.[10]   By contrast, the median of the total liabilities-to-capitalization ratio for comparable companies at the time of the WorkflowOne Acquisition was approximately 29%.

91.     The excessive debt and other obligations the Debtors incurred through the WorkflowOne Acquisition severely constrained their financial flexibility despite the significant

---

[8]     EBITDAP stands for Earnings Before Interest, Taxes, Depreciation, Amortization, and Pension income or expense, a non-GAAP earnings metric commonly used by companies with significant pension obligations.

[9]     For purposes of this analysis, comparable companies include Avery Dennison, Consolidated Graphics, Deluxe, Quad/Graphics, RR Donnelley, and Transcontinental.

[10]    Total Liabilities includes funded debt, capital leases and underfunded pension obligations.  The calculation of the total liabilities-to-capitalization ratio is based on the midpoint valuation under the traditional valuation methodologies.

and known risks in their financial projections, including secular declines in print products and related services, the erosion of healthcare service offerings as a result of the widespread implementation of electronic health records, and merger-related risks.

92.     Compounding this issue, the Debtors' cash needs following the WorkflowOne Acquisition were substantial.

93.     At the time of the WorkflowOne Acquisition, in addition to debt service on the Prepetition Term Loans, the Debtors projected that they would incur pension funding obligations of approximately $40 million in each of 2014 and 2015 and cumulative costs to achieve synergies of approximately $34 million over the same period.

94.     At the time of the WorkflowOne Acquisition, the combined company's total debt represented approximately 10.7 times its estimated 2014 unlevered free cash flow.

95.     The Prepetition Term Loans saddled the Debtors with substantial additional expenses, including $10 million of amortization payments per year under the First-Lien Term Loan, mandatory principal payments consuming as much as 75% of the Debtors' excess cash flow, and annual interest expense of approximately $20 million (nearly ten times their annual interest expense before the WorkflowOne Acquisition).

96.     Essentially, the Debtors' capital structure after closing on the WorkflowOne Acquisition was excessively leveraged and severely limited the Debtors' financial flexibility.

97.     ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████

98.    The Director and Officer Defendants, with due care and appropriate inquiry, and in the absence of any personal interest, should have known that the WorkflowOne Acquisition had an unreasonably high likelihood of render the Debtors unable to pay their debts as they became due, given the significant risks inherent in their financial projections (and in particular, their revenue projections).

99.    ███████████████████████████████████████████████████
████████████████████████████████████████████████

100.    In January 2015, the Debtors entered into an amendment to the Prepetition Term Loans, whereby the Debtors' secured lenders agreed to delay the testing date for certain covenants to avoid defaults under the Prepetition Term Loans.    ████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████

101.    The Debtors commenced these Chapter 11 Cases on the Petition Date and contemporaneously filed a motion to approve procedures for the auction and sale of substantially all of their assets.

102.    By the Sale Order, the Court authorized the Debtors to sell substantially all of their assets to Taylor Corporation (the "Sale").

103.    The Sale closed on July 31, 2015.

104.    The Sale generated insufficient proceeds to satisfy the full amount of the Debtors' alleged obligations under the Prepetition Term Loans and left the Debtors with over $300 million of unsecured debt remaining unpaid.

E.    **WorkflowOne Acquisition Executive Bonuses**

105.    In connection with the closing of the WorkflowOne Acquisition, Morgan and Ginnan were awarded bonuses (the "Transaction Bonuses") of up to $900,000 and $325,000,

respectively, with half paid at closing and the remainder to be paid in the first quarter of 2014 based on certain performance-related thresholds.

106.    In total, due in large part to the WorkflowOne Acquisition, Morgan's and Ginnan's total 2013 compensation (including the Transaction Bonuses) each more than doubled as compared to 2012.

107.    Morgan's and Ginnan's total 2013 compensation packages were on par with those of the CEO and CFO of Cenveo, a competitor with nearly double the Debtors' revenues.

108.    Because, among other things, the Debtors did not receive reasonably equivalent value and were left insolvent by the WorkflowOne Acquisition, the Debtors did not receive reasonably equivalent value for the Transaction Bonuses and other increased compensation paid to Morgan and Ginnan.

### FIRST COUNT
#### *Against the Director and Officer Defendants*
#### Breach of Fiduciary Duty

109.    The Trustee restates the allegations set forth in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

110.    The Director and Officer Defendants owed fiduciary duties including, among other things, duties of care, good faith, and loyalty, to the Debtors.

111.    The Director and Officer Defendants breached their fiduciary duties by, among other things, approving the WorkflowOne Acquisition without fully and adequately informing themselves as to the propriety thereof, including but not limited to relying on unrealistic and overly optimistic projections which they knew or should have known the business would not achieve after the WorkflowOne Acquisition was consummated.

112.    In fact, one of Silver Point's initial appointees to the Board ███████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████

113.    Morgan and Ginnan breached their fiduciary duties and acted with reckless disregard for the best interests of Standard Register by, among other things, ████████████
█████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████

114.    The Director and Officer Defendants acted with reckless disregard for the best interests of Standard Register and did not act in good faith, in the best interests of the corporation, or with the care an ordinarily prudent person in a like position would use under similar circumstances by, *inter alia,* ████████████████████████████████████
█████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████.

115.    The Directors and Officer Defendants were not disinterested in the WorkflowOne Acquisition as they stood to benefit from its consummation in a manner different from all stockholders generally through their maintenance of their positions of control and the receipt of significant transaction bonuses and other incentive compensation.

116.    The Director and Officer Defendants' breaches of their fiduciary duties in connection with the WorkflowOne Acquisition directly and proximately caused the waste and dissipation of the Debtors' assets to the detriment of the Debtors and their creditors and other stakeholders and have resulted in hundreds of millions of dollars of claims remaining unpaid.

**WHEREFORE**, the Trustee demands judgment in its favor and against the Director and Officer Defendants, awarding (a) actual, compensatory damages, (b) punitive damages, (c) interest, (d) reasonable attorneys' fees and costs, and (e) such other relief as the Court deems just and proper.

**SECOND COUNT**
***Against Defendants Morgan and Ginnan***
**Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B) (Bonuses)**

117.     The Trustee restates the allegations set forth in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

118.     Morgan and Ginnan received Transaction Bonuses in the amount of up to $900,000 and $325,000, respectively, in connection with the WorkflowOne Acquisition.

119.     Payment of the Transaction Bonuses was a transfer of an interest of the Debtors in property, as the term "transfer" is defined in section 101(54) of the Bankruptcy Code.

120.     The Debtors paid the Transaction Bonuses within two years before the Petition Date.

121.     The Debtors received less than reasonably equivalent value in exchange for the Transaction Bonuses.

122.     The Debtors became insolvent as a result of the WorkflowOne Acquisition and payment of the Transaction Bonuses.

123.     After paying the Transaction Bonuses, the Debtors were left with unreasonably small capital for the business in which they were engaged.

124.     When they paid the Transaction Bonuses, the Debtors intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts came due.

125.    By reason of the foregoing, the Transaction Bonuses constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

**WHEREFORE**, the Trustee, pursuant to sections 548, 550 and 551 of the Bankruptcy Code, demands judgment in its favor and against Morgan and Ginnan, (a) avoiding the payment of the Transaction Bonuses, (b) directing Morgan and Ginnan to disgorge the Transaction Bonuses, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

### THIRD COUNT
*Against Morgan and Ginnan*
**Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and Ohio Rev. Code § 1336.04(A)(2)
(Bonuses)**

126.    The Trustee restates the allegations set forth in the preceding paragraphs of this Amended Complaint as though fully set forth herein.

127.    Standard Register paid the Transaction Bonuses within four years prior to the date of this Amended Complaint.

128.    Standard Register did not receive reasonably equivalent value in exchange for the Transaction Bonuses.

129.    After paying the Transaction Bonuses, Standard Register was left with unreasonably small capital for the business in which it was engaged.

130.    When the Transaction Bonuses were paid, Standard Register intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond its ability to pay as such debts came due.

131.    The Transaction Bonuses were avoidable fraudulent transfers to or for the benefit of Morgan and Ginnan within the meaning of applicable state laws, including but not limited to the Ohio Uniform Fraudulent Transfer Act, Ohio Rev. Code. §§ 1336.01 *et seq.*

**WHEREFORE**, the Trustee demands judgment in its favor and against Morgan and Ginnan, pursuant to sections 544, 550 and 551 of the Bankruptcy Code and the Ohio Uniform Fraudulent Transfer Act, (a) avoiding the payment of the Transaction Bonuses, (b) directing Morgan and Ginnan to disgorge the Transaction Bonuses, and (c) awarding (i) reasonable attorneys' fees and costs, (ii) pre- and post-judgment interest, and (iii) such other relief as the Court deems just and proper.

## FOURTH COUNT
### Disallowance of Claims

132.    The Trustee restates the allegations set forth in the preceding paragraphs of this Complaint as though fully set forth herein.

133.    To the extent the Debtors' obligations to any of the Defendants are voidable under chapter 5 of the Bankruptcy Code, such Defendants' claims against the Debtors should be disallowed pursuant to section 502(d) of the Bankruptcy Code.

WHEREFORE, the Trustee demands judgment in its favor and against the Defendants (a) disallowing the Defendants' claims against the Debtors pursuant to section 502(d) of the Bankruptcy Code and (b) awarding such other relief as the Court deems just and proper.

## RESERVATION OF RIGHTS

134.    The causes of action set forth in this Amended Complaint are based upon the information that the Debtors have provided to date in connection with the filing of their Chapter 11 Cases and that the Debtors and certain other entities have provided in response to the Committee's formal and informal discovery requests.  Because discovery is ongoing, the Trustee may become aware of additional causes of action not set forth in this Amended Complaint. Accordingly, the Trustee reserves the right to (a) further amend this Amended Complaint, including but not limited to adding additional claims, specifically identifying any Additional

Parties whose identities become known, and modifying the claims asserted herein, and

(b) commence additional adversary proceedings or other proceedings or contested matters in the

future to allege other and further claims against the Defendants or any other parties.

Dated: August 4, 2015        **LOWENSTEIN SANDLER LLP**

Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Paul Kizel, Esq.
Wojciech F. Jung, Esq.
Andrew Behlmann, Esq.
65 Livingston Avenue
Roseland, NJ  07068
Telephone:  (973) 597-2500
Facsimile:  (973) 597-2400

 *-and -*

Gerald C. Bender, Esq.
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 262-6700
Facsimile:  (212) 262-7402

*Counsel to the Trustee*

 *-and-*

**POLSINELLI PC**

/s/ *Christopher A. Ward*
Christopher A. Ward
Justin K. Edelson
222 Delaware Avenue
Suite 1101
Wilmington, DE 19801
Telephone:  (302) 252-0920
Facsimile:  (302) 252-0921
cward@polsinelli.com
jedelson@polsinelli.com

*Delaware Counsel to the Trustee*