REDACTED COPY

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| SRC LIQUIDATION COMPANY, *et al.*, | Case No. 15-10541 (BLS) |
| Debtors. | (Jointly Administered) |
| EISNERAMPER LLP, NOT IN ITS INDIVIDUAL CAPACITY BUT AS TRUSTEE OF THE SRC LIQUIDATING GUC TRUST, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 15-50771 (BLS) |
| JOSEPH P. MORGAN, JR., ROY W. BEGLEY, JR., F. DAVID CLARKE, III, JOHN Q. SHERMAN, II, JULIE D. KLAPSTEIN, JOHN J. SCHIFF, JR., ROBERT M. GINNAN, R. ERIC MCCARTHEY, JOHN DOES 1-10, AND XYZ COMPANIES 1-10, | |
| Defendants. | |

## OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED ADVERSARY COMPLAINT

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney (No. 3578)
David J. Teklits (No. 3221)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: (302) 658-9200
Fax: (302) 658-3989

*Counsel for Defendants*


**MORRISON & FOERSTER LLP**
James Michael Peck*
Carl H. Loewenson, Jr.*
Robert J. Baehr*
250 West 55th Street
New York, NY 10019
Tel: (212) 468-8000
Fax: (212) 468-7900

James M. Koukios*
Lauren A. Navarro*
2000 Pennsylvania Avenue NW, Suite 6000
Washington, D.C. 20006
Tel. (202) 887-1500

*Counsel for Roy W Begley, Jr., F. David Clarke, III, John Q. Sherman, II, Julie D. Klapstein, John J. Schiff, Jr., and R. Eric McCarthey*

**JONES DAY**
Jeffrey J. Jones*
Charles M. Oellermann*
Marjorie P. Duffy*
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215
Tel: (614) 469-3939
Fax: (614) 461-4198

*Counsel for Robert M. Ginnan*


**SQUIRE PATTON BOGGS (US) LLP**
Joseph C. Weinstein*
Sean L. McGrane*
4900 Key Tower
127 Public Square
Cleveland, OH 44114
Tel: (216) 479-8500
Fax: (216) 479-8780

*Counsel for Joseph P. Morgan, Jr.*

---

\* *Pro hac* admission pending.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND.......................................................................................................... 2

I.     Standard Registry's History of Success—and Decline ............................................ 2

II.    Standard Register's Response to These Challenges: Restructuring and Pursuing a Strategic Combination ...................................................................................... 3

III.   Standard Register's Management and Expert Advisors Presented Projections to the Board in Connection with the WorkflowOne Acquisition ........................................ 6

IV.   The WorkflowOne Acquisition Closes, and the Market Reacts Favorably ...................10

V.    The Board Approves Bonuses that are Tied to the Performance of the Combined Company ......................................................................................................11

VI.   Standard Register Files for Chapter 11 ...............................................................12

VII.  The Unsecured Creditors Identify Silver Point as the Culprit in the Standard Register Bankruptcy, and Then Change Their Story After Silver Point Settles ..............13

ARGUMENT ............................................................................................................14

I.     The June 10, 2015 Standing Order Does Not Preclude This Motion to Dismiss ............14

II.    Standard of Review ........................................................................................15

III.   The Breach of Fiduciary Duty Claim (First Count) Should Be Dismissed Because the Amended Complaint Alleges No Facts that Rebut Ohio's Business Judgment Rule...............................................................................................................16

    A.    Under Ohio Law, Fiduciaries Are Presumed to Act with Care, in the Best Interest of the Company, and in Good Faith .......................................................16

    B.    The Amended Complaint Alleges No Facts that Would Overcome the Business Judgment Rule and Establish a Breach of the Duty of Care ................21

    C.    The Amended Complaint Pleads No Facts that Would Overcome the Business Judgment Rule and Establish a Breach of the Duty of Loyalty...........23

        1.    The Amended Complaint Pleads No Facts to Plausibly Establish Entrenchment ........................................................................................24

        2.    The Amended Complaint Pleads No Facts to Plausibly Demonstrate Disloyal Conduct.............................................................25

IV.   The Breach of Fiduciary Duty Claim (First Count) Should Be Dismissed Because the Amended Complaint Alleges No Facts that Would Support a Finding of Proximate Cause ...........................................................................................28

V.    The Claim for Punitive Damages (First Count) Should Be Dismissed Because the Amended Complaint Fails to Allege Any Facts that Would Establish Malice...............30

# TABLE OF CONTENTS
(continued)

Page

VI.   The Claims Against Morgan and Ginnan for Fraudulent Transfer (Second and
      Third Counts) Should Be Dismissed ...................................................................31

      A.    The Claim for Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(B)
            Should Be Dismissed ....................................................................................31

            1.    The "Transaction Bonuses" Were a Pre-Existing Debt and Thus
                  Cannot Support a Claim for Constructive Fraudulent Transfer...............32

            2.    The Allegations that the Company Was Insolvent at the Time of
                  the Acquisition Are Implausible ............................................................34

            3.    The Amended Complaint Fails to Allege Any Other Basis for the
                  Constructive Fraudulent Transfer Claim ................................................35

      B.    The Amended Complaint's Claim for Fraudulent Transfer Under the Ohio
            Uniform Fraudulent Transfer Act Should Be Dismissed for Similar
            Reasons .......................................................................................................36

CONCLUSION..................................................................................................................37

# TABLE OF AUTHORITIES

**Page**

CASES

*Abrahamson v. Waddell*,
   63 Ohio Misc. 2d 270 (Ohio C.C.P. 1992) .......................................................................21

*Anderson v. City of Massillon*,
   134 Ohio St. 3d 380 (2012) ..........................................................................................23

*Ashcroft v. Iqbal¸*
   556 U.S. 662 (2009)......................................................................................................15

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
   891 A.2d 150 (Del. Ch. 2005) ......................................................................................24

*Bodkin v. Mercantile Stores Co.*,
   No. 13770, 1996 WL 652763 (Del. Ch. Nov. 1, 1996)......................................................24

*Brautigam v. Damon*,
   No. 1:11-cv-551, 2012 WL 481844 (S.D. Ohio Feb. 14, 2012) .................................... 16, 29

*Brosz v. Fishman*,
   No. 1:13-cv-753, 2015 WL 1782579 (S.D. Ohio Apr. 14, 2015) .......................................19

*Cullen v. Milligan*,
   No. 89AP-396, 1990 WL 85133 (Ohio Ct. App. June 21, 1990) .........................................18

*Edgar v. MITE Corp.*,
   457 U.S. 624 (1982)......................................................................................................17

*Freedman v. Redstone*,
   753 F.3d 416 (3d Cir. 2014) ...........................................................................................28

*Gries Sports Enters., Inc. v. Cleveland Browns Football Co.*,
   26 Ohio St. 3d 15 (1986) ...............................................................................................19

*In re Aphton Corp. (Walker v. Sonafi Pasteur)*,
   423 B.R. 76 (Bankr. D. Del. 2010) .................................................................................32

*In re Caterpillar Inc. Deriv. Litig.*,
   No. 12-1076-LPS-CJB, 2014 WL 2587479 (D. Del. June 10, 2014).....................................3

*In re Celera Corp. S'holder Litig.*,
   No. 6304-VCP, 2012 WL 1020471 (Del. Ch. Mar. 23, 2012) .............................................21

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In re Circle Y (Burtch v. Dent),*
354 B.R. 349 (Bankr. D. Del. Nov. 21, 2006) ..................................................32

*In re Conex Holdings, LLC* (*Stanziale v. Heico Holdings, Inc.*),
514 B.R. 405 (Bankr. D. Del. 2014) ...................................................................15

*In re Crucible Materials Corp. (Gellert v. Coltec Indus.),* Nos. 09-11582 (MFW), Adv.
No. 11-53884 (MFW), 2012 WL 5360945 (Bankr. D. Del. Oct. 31, 2012) .........................34

*In re Fedders N. Am., Inc.* (*Official Comm. of Unsecured Creditors of Fedders N. Am.,*
*Inc. v. Goldman Sachs*), 405 B.R. 527 (Bankr. D. Del. 2009) ....................... 15, 17, 25, 31, 33

*In re Gas Natural, Inc.,*
No. 1:13 CV 02805, 2015 WL 3557207 (N.D. Ohio June 4, 2015) ....................................20

*In re Gavin (Rhiel v. Mortg. Elec. Registration Sys.),* Nos. 08-60881, Adv. Proc. 09-2059,
2011 Bankr. LEXIS 2613 (Bankr. S.D. Ohio July 11, 2011) ...............................................36

*In re Global Link (Global Link v, Avantel),*
327 B.R. 711 (Bankr. D. Del. 2005) ...................................................................32

*In re The Goodyear Tire & Rubber Co. Deriv. Litig.,*
Nos. 5:03CV2180, 5:03CV2204, 5:03CV2374, 5:03CV2468, 5:03CV2469,
2007 WL 43557 (N.D. Ohio Jan. 5, 2007) ...............................................................*passim*

*In re Grove-Merritt (Slone v. Lassiter),*
406 B.R. 778 (Bankr. S.D. Ohio June 2, 2009) ................................................................37

*In re Hydrogen (Official Comm. of Unsecured Creditors of Hydrogen L.L.C. v. Blomen),*
431 B.R. 337 (Bankr. S.D.N.Y. 2010) .................................................................16

*In re Iridium Operating LLC (Statutory Comm. of Unsecured Creditors on behalf of*
*Iridium Operating LLC v. Motorola, Inc.),* 373 B.R. 283 (Bankr. S.D.N.Y. 2007) ...............34

*In re Keithley Instruments, Inc.,*
599 F. Supp. 2d 908 (N.D. Ohio 2009) .............................................................17

*In re Midway Games (Official Comm. of Unsecured Creditors of Midway Games Inc. v.*
*Nat'l Amusements Inc.),* 428 B.R. 303 (Bankr. D. Del. 2010) .............................................33

*In re NAHC, Inc. Sec. Litig.,*
306 F.3d 1314 (3d Cir. 2002) ...................................................................3

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Telxon Corp. Sec. Litig.*,
   133 F. Supp. 2d 1010 (N.D. Ohio 2000) ...........................................................................16

*In re Toys "R" Us, Inc. S'holder Litig.*,
   877 A.2d 975 (Del. Ch. 2005) ...........................................................................................26

*In re Ultimate Escapes Holdings, LLC (Gavin v. Tousignant)*,
   Nos. 10-12915 (BLS), 2015 WL 1590132 (Bankr. D. Del. Feb. 5, 2015) ...........................19

*In re Vertis Holdings (Riverside Acquisition Grp. v. Vertis Holdings, Inc.)*,
   536 B.R. 589 (Bankr. D. Del. Sept. 11, 2015) ....................................................................26

*Kademian v. Marger*,
   2014-Ohio-4408 (Ohio Ct. App. Oct. 3, 2014) ...................................................................29

*Kaufman v. Allemang*,
   740 F. Supp. 3d 682 (D. Del. 2014) ...................................................................................15

*Koos v. Cent. Ohio Cellular*,
   94 Ohio App. 3d 579 (Ohio Ct. App. 1994) .................................................................19, 25

*McConnell v. Bare Label Prods., Inc.*,
   2015-Ohio-1206 (Ohio Ct. App. Mar. 31, 2015)................................................................30

*Miller v. Keybank Nat'l Ass'n*,
   2006-Ohio-1725 (Ohio Ct. App. April 6, 2006)..................................................................31

*Miramar Firefighters Pension Fund v. AboveNet, Inc.*,
   No. 7376-VCN, 2013 WL 4033905 (Del. Ch. July 31, 2013)........................................21, 22

*Monday v. Meyer*,
   No. 1:10–cv–1838, 2011 WL 5974664 (N.D. Ohio Nov. 29, 2011).....................................19

*NCS Healthcare, Inc. v. Candlewood Partners, LLC*,
   160 Ohio App. 3d 421 (Ohio Ct. App. 2005).....................................................................20

*Preston v. Murty*,
   32 Ohio St. 3d 334 (1987)..........................................................................................30, 31

*Radol v. Thomas*,
   772 F.2d 244 (6th Cir. 1985) ...............................................................................17, 19, 23

*Raul v. Rynd*,
   929 F. Supp. 2d 333 (D. Del. 2013) .............................................................................21, 26

**TABLE OF AUTHORITIES**
(continued)

Page

*Ret. Sys. v. Crawford*,
    918 A.2d 1172 (Del. Ch. 2007)...................................................................19

*Stepak v. Schey*,
    51 Ohio St. 3d 8 (1990)..............................................................................18

**STATUTES**

11 U.S.C.
    § 548.......................................................................................................36, 37
    § 548(a)(1)(A)................................................................................................31
    § 548(a)(1)(B).........................................................................31, 32, 35, 36
    § 548(d)(2)(A)...............................................................................................32

Fed. R. Civ. Proc. 12(b)(6)............................................................................14, 15

Ohio Rev. Code
    § 1336.04........................................................................................................36
    § 1336.04(A)(2)...........................................................................................36
    § 1701.59........................................................................................................18
    § 1701.59(B)..................................................................................................17
    § 1701.59(C)..................................................................................................18
    § 1701.59(D)......................................................................................18, 19, 21
    § 1701.59(E)..................................................................................................23
    § 1701.60........................................................................................................18

**OTHER AUTHORITIES**

Baldwin's Oh. Prac. Bus. Org. § 28:25 (2014 ed.)......................................18

Collier on Bankruptcy ¶ 548.03[5] (16th ed. 2015) ...................................32

## PRELIMINARY STATEMENT

The Official Committee of Unsecured Creditors (the "Committee") was granted authority to pursue estate claims at a time when Silver Point Capital L.P. was the main target of the Committee's attention.  That did not last long.  The Committee's claims against Silver Point were resolved quickly in exchange for a settlement payment of $5 million.  Now, having obtained a quick settlement, the Committee's adversary proceeding has been repurposed.[1] Missing from the Amended Adversary Complaint (the "Amended Complaint") are the colorful allegations of insider corporate dealings that were presented to the Court when it decided to authorize standing in the first place.  Since then, most of the sting has been taken out of the litigation.  References to economic motivation are gone, and so is Silver Point, the former target of so much of the Committee's earlier zealous antagonism.  All that remains in the Amended Complaint is second-guessing, as the Committee makes a hindsight-based attack on a good-faith but ultimately unsuccessful business decision to acquire WorkflowOne—a decision that falls squarely within the broad protections of Ohio's business judgment rule.

The watered-down Amended Complaint is woefully thin on factual allegations against the current defendants—a deficiency that is particularly striking in light of the Committee's access to thousands of pages of discovery, including Board minutes and expert analyses of the WorkflowOne transaction, before it filed its Amended Complaint.  Indeed, the Amended Complaint ignores and omits facts of which the Committee is well aware.  Those facts

---

[1] Upon settling with Silver Point, the Committee placed its $5 million payment in a trust for the benefit of General Unsecured Creditors and designated EisnerAmper LLP to serve as trustee to continue pursuing this adversary proceeding. (Settlement Agreement at 3, *In re The Standard Register Co.*, No. 15-10541 (BLS) ("*In re SRC*"), (Bankr. D. Del. June 19, 2015), ECF No. 696-1.)  EisnerAmper LLP as trustee has since been substituted as plaintiff in this adversary proceeding (ECF No. 5).  For purposes of the present motion, and in the interests of simplicity, the term "Committee" refers to both the Official Committee of Unsecured Creditors, which filed the original complaint,  and EisnerAmper LLP as trustee, which filed the Amended Complaint.

show that Standard Register's officers and directors acted, at all times, in good faith and in accordance with their fiduciary duties.   The result is an Amended Complaint that relies exclusively on conclusory allegations and hindsight and fails on its face to overcome the robust protections afforded by Ohio's business judgment rule.  Dismissal is appropriate now.

The officers and directors of Standard Register were always little more than "tag along" defendants in the original complaint, named not because of any demonstrated breaches of duty on their part but as a means to an end—recourse to applicable insurance coverage.  This litigation is being prosecuted solely for the purpose of trying to mine a stack of D&O insurance coverage.   But the claims have no merit.   This is an example of an all too familiar pattern in which companies with over-leveraged capital structures enter bankruptcy with few unencumbered assets, thereby incentivizing creditors to take extreme positions in the pursuit of any available source of recovery.  The objective is understandable, but the problem here is that the Amended Complaint fails to state any viable claims.

The defendants are entitled as a matter of law to be insulated from lawsuits like this.   That the WorkflowOne transaction was followed more than a year later by a chapter 11 filing does not justify a vexatious lawsuit predicated on hindsight bias.   Business decisions by their nature are forward looking and uncertain, and the business judgment rule must be enforced to protect officers and directors from lawsuits such as this one.

## BACKGROUND

### I.    Standard Registry's History of Success—and Decline.

For nearly 100 years, the Standard Register Company enjoyed a sustained record of success in the hard-copy print industry.  (¶¶ 20–22.)[2]  But that industry began to decline around

---

[2]  Unless noted otherwise, all paragraph references ("¶ __") are to the Amended Adversary Complaint, ECF No. 6, filed on August 4, 2015.

the turn of the 21st century.  (¶¶ ██████████████████████████ ), 68 (alleging

"secular headwinds" in the print industry).)  Standard Register's officers and directors were, not

surprisingly, keenly aware of this trend and its impact on the company.  From 2010 to 2012,

Standard Register's public filings recognized that demand for traditional printing services had

been declining as a result of advances in technology and the proliferation of digital, electronic,

and internet-based communication and marketing options, and that the print market was highly

competitive and oversupplied.  (*See* Ex. 1, SEC Form 10-K for 2010 at 6; Ex. 2, SEC Form 10-K

for 2011 at 5; Ex. 3, SEC Form 10-K for 2012 at 3 (discussing market trends).)$^{3}$

In addition to these industry-wide "headwinds," ████████████████████████

████████████████████████████████████████████████████  Standard

Register's management and Board were also keenly aware of this issue and its operational

consequences.  The company disclosed that its pension plan was underfunded due to weak

market returns and historically low long-term interest rates.  (Ex. 2, SEC Form 10-K for 2011 at

13.)  This caused the company to suspend the payment of quarterly dividends.  (¶ 83; Ex. 2, SEC

Form 10-K for 2011 at 32.)

## II.    Standard Register's Response to These Challenges: Restructuring and Pursuing a Strategic Combination.

Faced with these challenges, Standard Register's management and Board had a decision

to make: either they could stand pat and continue to lose ground or they could take action and try

to reverse these trends.  They chose the latter.  First, in January 2012, management proposed, and

---

$^{3}$ On this motion, the Court may consider documents filed with the Securities and Exchange Commission or referred to in the Amended Complaint, publicly available stock prices, and other matters of public record.  *E.g.*, *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002); *In re Caterpillar Inc. Deriv. Litig.*, No. 12-1076-LPS-CJB, 2014 WL 2587479, at *1 n.2 (D. Del. June 10, 2014).  Documents properly considered on this motion are filed as exhibits to the Declaration of Robert J. Baehr in Support of Defendants' Motion to Dismiss the Amended Adversary Complaint and referred to as "Ex. __."

the Board authorized, a "strategic restructuring plan" designed to modernize the company's business. (Ex. 4, January 19, 2012 Form 8-K.) As the company explained publicly, Standard Register was undertaking "a strategic restructuring program to better align the Company's resources in support of its growing core solutions business and to reduce costs to offset the impact of declining revenue in its legacy operations." (*Id.* at Ex. 99.1 at 1.) The company projected that the restructuring, which included a reduction in workforce and cuts in declining product and service lines, would result in an estimated $45 million in savings, enough for breathing room and "sufficient liquidity and capital resources to fund [its] near-term operations and growth objectives." (*Id.* at 2.)

By mid-2012, Standard Register's management and Board also began to explore strategic combinations ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    ██████    But, as the Amended Complaint implicitly concedes, neither management nor the Board *rejected* an acquisition offer by this larger competitor—because no offer was ever made.

Meanwhile, WorkflowOne presented itself as a willing acquisition target. ████████ Standard Register and WorkflowOne had briefly explored the prospect of combining several years earlier. ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████▌  ████  ████████████████████

---

[4] The Committee cherry picks from Standard Register's Board minutes regarding the decision not to pursue a combination with WorkflowOne in July 2010. ████████████

████████████████████████████████████████████████████

██████████████████.    Indeed, just two months later, in September 2010, WorkflowOne and several of its direct and indirect subsidiaries filed chapter 11 petitions.  (¶ 35.)  ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████)[5]    WorkflowOne's plan of reorganization was confirmed in February 2011.   (¶ 36.) Silver Point obtained substantial control over WorkflowOne as a result of the reorganization. (Orig. Compl. ¶ 55.)  The Amended Complaint does not acknowledge that WorkflowOne's debt then declined significantly.    By 2012, when WorkflowOne again presented itself as an acquisition target, WorkflowOne's finances were significantly better than they had been in 2010. (*See* ¶¶ 37–38.)

Standard Register's financial picture had also changed, as discussed above.  Standard Register's management and Board recognized that a combination with a competitor could result in significant synergies that would reduce the combined companies' costs and potentially increase profit margins.  (*See* ¶¶ 25, 80, 81, 86, 93 (acknowledging synergies).)  A combination now potentially made sense both financially and operationally.

As the Amended Complaint implicitly concedes, Standard Register's management and Board did not rush into the WorkflowOne transaction.  To the contrary, Standard Register's management and Board considered the potential combination for a year before it closed.  ████  ████████    During this time, while still pursuing potential alternative combinations with other competitors ██████  Standard Register's management and Board considered financial projections

████████████████████████████████████████████

---

[5] "Orig. Compl." refers to the original Adversary Complaint, ECF No. 1, filed on June 8, 2015.

regarding the combined company to determine whether the WorkflowOne acquisition made business and financial sense.  (¶¶ 18, ████████ 98, 111, ████████  Only after this long period of careful deliberation did the Board approve the WorkflowOne acquisition. ██████

### III.    Standard Register's Management and Expert Advisors Presented Projections to the Board in Connection with the WorkflowOne Acquisition.

The Amended Complaint references the projections presented to the Board in connection with the WorkflowOne Acquisition more than a dozen times (¶¶ 18, ██████ 70, 91, ██ 98, 111, ██████████████████████████████████████████████████████████.  But the Amended Complaint alleges nothing at all about their preparation, much less any facts to support the conclusory assertion that the projections were "unrealistic and overly optimistic."  (*E.g.*, ¶¶ 56, 59, ████ 113–14.)  This omission is striking because the projections—along with the minutes for the Board meetings at which the projections were presented and discussed—were produced to the Committee months ago, and the Committee's fee applications reveal that its professionals have spent dozens of hours reviewing them since March 2015.  (*See* First Application for Compensation for Services Rendered as Counsel to the Committee, Ex. A at 36, 40 of 43, *In re SRC* (May 19, 2015), ECF No. 529-2; Second Application for Compensation for Services Rendered as Counsel to the Committee, Ex. A at 51 of 99, *In re SRC* (June 9, 2015), ECF No. 640-2; Third Application for Compensation for Services Rendered as Counsel to the Committee, Ex. A at 54 of 78, *In re SRC* (June 16, 2015), ECF No. 676-2; Fourth Application for Services Rendered as Counsel to the Committee, Ex. A at 89 of 93, *In re SRC* (July 7, 2015), ECF No. 788-2.)

At bottom, the Amended Complaint asserts that ████████████████████████ ████████████████████████████████████████████████████████████████

6

███████████████████████████████████████████ ███ [6]    But the

Amended Complaint otherwise alleges no facts that would undermine the projections, much less

the defendants' reliance on them.  For example:

- The Amended Complaint fails to allege any specific errors in the methodology used to generate the projections—or that any of the defendants were aware of any such shortcomings when the Board approved the WorkflowOne acquisition. For example, the Amended Complaint does not challenge the company's reasonable expectations that interest rates would increase over the long term and thereby reduce its underfunded pension liability or that the WorkflowOne acquisition would result in significant synergies.

- The Amended Complaint does not allege that the projections were prepared by unqualified individuals.  For example, it does not allege that Ginnan, Morgan, or the rest of the management team were unfamiliar with the company's business, financial planning, budgeting process, or financial performance or with the printing and marketing industry as a whole.

- The Amended Complaint does not allege that Standard Register's due diligence review of WorkflowOne did not permit a reasonable estimate of WorkflowOne's future revenues under the circumstances.

In some instances, the Amended Complaint mischaracterizes what the Committee knows to be

true (from the documents it possesses).  For example:

- The Amended Complaint fails to acknowledge ███████████████████████████████████████████████

- The Amended Complaint also fails to acknowledge that Morgan and Ginnan ███████████████████████████████████████████████

The Amended Complaint also never acknowledges that the projections were incorporated

into financial analyses by the Board's financial advisor, Bank of America Merrill Lynch

---

[6]  The Amended Complaint also alleges ███████████████████████████████████████████████████████████████████████████████████████

("BAML").    As the Committee is well aware (from the documents in its possession), from

January 2012 until the WorkflowOne acquisition in July 2013, the Board was advised by BAML

regarding the WorkflowOne acquisition and other potential combinations. [7]  As the Committee is

also well aware (again, from documents in its possession), the Board was assisted by other

advisors as well: Gibson Dunn regarding fiduciary duties and Capstone Advisory Group, which

provided a solvency opinion regarding the transaction. [8]  The Amended Complaint does not even

acknowledge these advisors, much less allege any facts that would establish that the Board's

reliance on their advice (as expressly authorized under Ohio law) was unwarranted.

Instead, the Amended Complaint summarily repeats—viewing the ultimate accuracy of

the projections through the rear-view mirror of the eventual bankruptcy—that the projections

were "unrealistic and overly optimistic."   (*E.g.*, ¶¶ ███ 111, ███)  The Committee's

inability to identify any facts showing any flaw in the preparation of the projections is telling

because the Committee had the benefit of thousands of pages in discovery when it drafted its

Amended Complaint.   (Committee's Mot. to Commence and Prosecute Certain Actions, *In re*

*SRC* (May 18, 2015), ECF No. 524 at ¶ 10 (the Company "produced a number of documents

responsive to the Committee's discovery requests"); Hearing Tr. at  47:7–9, *In re SRC* (June 8,

2015) ("Silver Point produced almost 50,000 pages of documents and the Debtors did the

same."); *see also* ECF Nos. 529-2, 640-2, 676-2, 788-2 (Committee's fee applications

evidencing hundreds of hours spent on discovery).)   In addition, Morgan and Ginnan each

submitted sworn declarations detailing, among other things, how the projections were prepared

and presented to the Board. (*In re SRC* (June 1, 2015), ECF Nos. 586 ("Morgan Decl."), 588

---

[7] *See, e.g.*, ECF No. 640-2 at 51 of 99 (time spent reviewing "BAML's presentation to the SR board"); ECF No. 676-2 at 54 of 78 (same).

[8] *See, e.g.*, ECF No. 640-2 at 51 of 99 (time spent "[r]eview[ing] Capstone opinion given to debtors at time of acquisition"); *id.* (time spent reviewing "solvency and projection analysis").

8

("Ginnan Decl.").)  Notwithstanding the Committee's access to such materials, the Committee fails to craft an Amended Complaint that alleges any facts that would cast doubt on the good faith of the defendants, including their reasonable reliance on respected expert advisors, or their own careful and diligent  conduct.

The Committee also alleges that Standard Register overpaid for WorkflowOne.  ▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉  The Committee does not allege that anyone from Standard Register knew about Silver Point's *internal* valuation of WorkflowOne.  To the contrary, the Committee acknowledges, as it must, that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Using information available to non-insiders and obtained through the due diligence process, BAML presented to the Standard Register Board a valuation analysis and a fairness opinion, on which the Board relied when approving the WorkflowOne acquisition.  Both of those documents were produced to and reviewed by the Committee months ago.  (*See supra* footnote 7; *see also* Morgan Decl. Ex. B, ECF No. 586-2 (BAML's valuation analysis) at 4–7; *id*. Ex. C, ECF No. 586-3 (BAML fairness opinion).)  Again, the Amended Complaint alleges no facts about BAML's analyses, including its fairness opinion, much less any facts that would undermine their reliability or that would support a finding that the Board's reliance on those analyses was unwarranted.

The Amended Complaint also takes issue with the structure of the acquisition price. (¶¶ 63, 66.)  The Amended Complaint alleges ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

9

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████    But the Amended Complaint does not plausibly allege any facts of which the Board was aware, and yet disregarded, that would have led it to conclude that Standard Register could not satisfy the proposed covenants on the new debt. Indeed, though the Committee fails to acknowledge it in the Amended Complaint, it knows that BAML █████████████████████████████████████████ █████████████ (*See supra* footnote 7 (evidencing the Committee's review of BAML's analysis); *see also* Morgan Decl. Ex. B, ECF No. 586-2 (BAML's valuation analysis) at 13.)   Likewise, the Amended Complaint fails to acknowledge that Standard Register retained Capstone to provide a solvency opinion with respect to the transaction and that such an opinion was provided.   The Amended Complaint does not challenge any of Capstone's conclusions██████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

even though Capstone's opinion was produced to and reviewed by the Committee months ago and attached to Morgan's declaration.   (*See supra* footnote 8 (evidencing the Committee's review of Capstone's opinion); *see also* Morgan Decl. Ex. D, ECF No. 586-4 (Capstone opinion).)

## IV.    The WorkflowOne Acquisition Closes, and the Market Reacts Favorably.

On July 31, 2013, the Board, having considered all available information, including the opinions of its expert advisors, met and unanimously approved the WorkflowOne acquisition. (*See* Ex. 6, August 1, 2013 Form 8-K.)   The deal closed and was announced publicly the next day.   (*Id.* at Exs. 99-1, 99-2.)

The market's reaction was overwhelmingly positive.  On July 31, 2013, the day of the Board's final meeting to approve the transaction, Standard Register's stock price closed at $3.00 per share.  On August 1, 2013, the day the deal was announced, Standard Register's stock price skyrocketed by 360%.  The stock price closed at a five-year high of $13.80 per share that day and continued to trade at levels above the pre-announcement price for more than a year thereafter:



## V.    The Board Approves Bonuses that are Tied to the Performance of the Combined Company.

On July 31, 2013, one day before the WorkflowOne acquisition closed, the Board approved transaction-related bonuses for Ginnan and Morgan, with a cash component of up to $325,000 for Ginnan and up to $900,000 for Morgan.  The Board also approved equity grants of performance-related restricted stock and time-vested restricted stock.  (Ex. 6, August 1, 2013 Form 8-K at 9.)  The time-vested restricted stock would fully vest in 2016 and the performance-related restricted stock would vest "based on the achievement of certain performance goals over

11

three years." (*Id.* at 9-10.)  The Amended Complaint ignores the equity awards and the contingent nature of the performance-related restricted stock.

The Amended Complaint also looks past the fact that half of the cash bonus amounts was contingent.  For Morgan and Ginnan to be entitled to the remainder of the bonuses, the company had to attain "certain performance-related thresholds" in the "first quarter of 2014"—two quarters after the closing of the WorkflowOne transaction.  (*Id.* at 9.)  The Amended Complaint acknowledges that Morgan and Ginnan received the full amount of their cash bonuses (¶¶ 54–55), thereby implicitly conceding that the combined company enjoyed initial success and satisfied the thresholds upon which the bonuses were contingent.[9]

## VI.    Standard Register Files for Chapter 11.

Immediately after the transaction was announced, Standard Register began executing on its plan to combine and integrate with WorkflowOne.  Up through February 2015, the company was on track to achieve, if not exceed, the level of synergies that management had projected.  Continued low interest rates in 2014 and 2015, however, plagued the company longer than anticipated.  As a result, the company continued to be hampered by its high pension obligations.  Standard Register missed revenue expectations in the first two quarters of 2014 and, while revenue quickly stabilized and was on track for subsequent quarters, ██████████████████ ██████████████████████████████████████████████████.  (Orig. Compl. ¶ 133.)

████████████████████████████████████████████████████████

---

[9]  The Amended Complaint also ignores that Standard Register's Board maintained a compensation committee that was advised by outside compensation advisors at the Semler Brossy Consulting Group.  (Ex. 7, March 14, 2014 DEF 14A at 15 (referenced at ¶¶ 54–55).)  The Amended Complaint does not allege that Ginnan or Morgan were involved in or otherwise influenced any compensation-related decision.  Nor could it, as neither Morgan nor Ginnan were members of the compensation committee.  (*Id.* at 9 ("All members" of the compensation committee are "independent directors").)

███████████████████████████████████████████ (*Id.* ¶¶ 136–

37.)    As a result, on March 15, 2015, Standard Register filed for chapter 11 bankruptcy

protection in this Court.

## VII.    The Unsecured Creditors Identify Silver Point as the Culprit in the Standard Register Bankruptcy, and Then Change Their Story After Silver Point Settles.

On May 18, 2015, the Committee moved for standing to prosecute actions on behalf of

the Debtors' estates, filing with its motion a proposed adversary complaint.    (ECF No. 524.)

With some revisions, the Court granted the Committee standing to file the complaint.    (Order

Authorizing Committee to Prosecute, *In re SRC* (June 10, 2015), ECF No. 648.)    On June 8,

2015, the Committee filed its original complaint.

The proposed complaint was overwhelmingly focused on Silver Point and other "Term

Loan Defendants" that are not part of the Amended Complaint.    As filed, the original complaint

continued that focus.    The first paragraph of that original complaint summarized the Committee's

theory of the case as follows and Silver Point's prominent role in it:

> These Chapter 11 Cases are the final act in a strategy orchestrated by Silver Point
> to obtain ownership of the Debtors' business, eviscerate hundreds of millions of
> dollars of unsecured claims, offload liability for the Debtors' underfunded defined
> benefit pension plan onto the PBGC, and reap the resulting cash flow benefits
> entirely for itself at the expense of the Debtors' other creditors and stakeholders.

(Orig. Compl. ¶ 1.)    According to the original filed complaint, Silver Point forced WorkflowOne

into bankruptcy in 2010, after which Silver Point acquired significant control over

WorkflowOne.    (*See id.* ¶¶ 49, 55.)    After Standard Register acquired WorkflowOne, the original

complaint alleged, Silver Point obtained significant control over Standard Register.    (*Id.* ¶¶ 123–

24.)    Silver Point then, as it had done several years earlier with WorkflowOne, forced Standard

Register into bankruptcy.    (*Id.* ¶ 140.)    In short, the original complaint blamed Silver Point for

Standard Register's bankruptcy.    It was therefore more than a little surprising when, less than

13

two weeks after it filed the original complaint, the Committee reached a settlement with Silver Point, resolving all claims against Silver Point for $5 million.   (ECF No. 696.)

Having grabbed a quick settlement from Silver Point, the Committee filed an Amended Complaint that is dramatically different in tone and content from its predecessor.  Most notably, the Amended Complaint no longer mentions Silver Point's role in forcing either WorkflowOne or Standard Register into bankruptcy.  Rather, the Committee now focuses exclusively on the decision made by Standard Register's officers and directors, after a long period of careful consideration, to acquire WorkflowOne as the supposed cause of the company's eventual bankruptcy.

## ARGUMENT

### I.     The June 10, 2015 Standing Order Does Not Preclude This Motion to Dismiss.

The Court's previous determination that the Committee had standing to pursue the original complaint does not preclude dismissal of the Amended Complaint under Rule 12(b)(6) as to all defendants.  First, as this Court has recognized in a previous matter, the decision to grant a standing order

> is in no respect a conclusion, or a comment, or a determination, or a finding that some, most, or all of the claims and causes of action that have been articulated may or may not be subject to dismissal under Rule 12, and I would expect that there would be substantial motion practice in the motion to dismiss context under Rule 12 at the earliest stages of this litigation.

(Hearing Tr. at 99:25–101:6, *In re Fedders N. Am., Inc.*, No. 07-11176 (Bankr. D. Del. March 24, 2008), ECF No. 933.)  The Court made a similar statement in connection with granting the Committee standing here.   (Hearing Tr. at 26:25–27:6, *In re SRC* (June 8, 2015) (remarking that the standard applied at the standing stage is less rigorous than at the Rule 12 stage).)  Second, the original proposed complaint that was before the Court in connection with the standing issue is radically different in tone and content from the Amended Complaint, which is the subject of the

instant motion.   As discussed above, whereas the complaint that this Court previously considered overwhelmingly focused on Silver Point, the Amended Complaint focuses exclusively on Standard Register's officers and directors—who are entitled to the protections of Ohio's business judgment rule.   The sufficiency of the allegations of the Amended Complaint must be assessed accordingly.

## II.    Standard of Review.

A Rule 12(b)(6) motion to dismiss serves to test the sufficiency of the factual allegations in a plaintiff's complaint.   *In re Fedders N. Am., Inc.* (*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs*), 405 B.R. 527, 536–37 (Bankr. D. Del. 2009) (Shannon, J.) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   In considering a motion to dismiss, the Court must accept as true only the complaint's well-pleaded factual allegations.   *Id.* at 537.   Mere labels, conclusions, or formulaic recitations of the elements of a cause of action are insufficient to state an actionable claim.   *Id.* (citing *Twombly*, 550 U.S. at 555).   Courts in the Third Circuit apply a "two-part analysis when reviewing a Rule 12(b)(6) motion."   *Kaufman v. Allemang*, 740 F. Supp. 3d 682, 690 (D. Del. 2014).   First, the court should "separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions."   *Id.* Second, the court should "determine whether the . . . plaintiff has a plausible claim for relief."   *Id.* (internal quotation marks omitted).

A claim is plausible only if the complaint contains sufficient factual matter to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal¸* 556 U.S. 662, 678 (2009).   As the United States Supreme Court has made clear, the plausibility standard is not met when a complaint merely "tenders 'naked assertions' devoid of 'further factual enhancement.'"   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).   Courts routinely dismiss such deficient complaints.   *See, e.g.*, *In re Conex Holdings, LLC*

15

(*Stanziale v. Heico Holdings, Inc.*), 514 B.R. 405, 414 (Bankr. D. Del. 2014) (dismissing claims for breach of fiduciary duty under Texas law where trustee "failed to provide facts with any specificity to support how any of the Individual Defendants breached any fiduciary duty"); *In re Hydrogen (Official Comm. of Unsecured Creditors of Hydrogen L.L.C. v. Blomen)*, 431 B.R. 337, 345, 348 (Bankr. S.D.N.Y. 2010) (applying Ohio law and dismissing claims for breach of fiduciary duty where complaint lacked "the requisite factual support"); *In re The Goodyear Tire & Rubber Co. Deriv. Litig.*, Nos. 5:03CV2180, 5:03CV2204, 5:03CV2374, 5:03CV2468, 5:03CV2469, 2007 WL 43557, at *9 (N.D. Ohio Jan. 5, 2007) (granting a motion to dismiss and finding that the allegations merely repeated the statutory language in the negative, and was "wholly unsupported by facts that might lead to such a conclusion"); *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1024 (N.D. Ohio 2000) ("[T]he Court need not accept as true a legal conclusion couched as a factual allegation.  A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements.") (citation omitted).

**III.     The Breach of Fiduciary Duty Claim (First Count) Should Be Dismissed Because the Amended Complaint Alleges No Facts that Rebut Ohio's Business Judgment Rule.**

The First Count of the Amended Complaint alleges that Standard Register's officers and directors breached their fiduciary duties of care, good faith, and loyalty to Standard Register when they approved the WorkflowOne acquisition.  As explained below, however, the Amended Complaint fails to allege facts that would overcome the robust protections afforded by Ohio's business judgment rule and, therefore, the First Count must be dismissed.

**A.     Under Ohio Law, Fiduciaries Are Presumed to Act with Care, in the Best Interest of the Company, and in Good Faith.**

To state a claim for breach of fiduciary duty under Ohio law, a plaintiff must sufficiently allege "(1) the existence of a duty arising from a fiduciary relationship, (2) a failure to observe the duty, and (3) an injury proximately resulting therefrom." *Brautigam v. Damon*, No. 1:11-cv-

16

551, 2012 WL 481844, at *7 (S.D. Ohio Feb. 14, 2012).[10]  Directors of an Ohio corporation

typically owe to the corporation a duty of care and a duty of loyalty.  *Radol v. Thomas*, 772 F.2d

244, 256–57 (6th Cir. 1985).  These duties are codified at Ohio Revised Code § 1701.59(B):

"under the duty of care, a director must perform his duties 'with the care that an ordinary prudent

person in a like position would under a similar circumstances,'" while "under the duty of loyalty

a director 'shall perform his duties as a director . . . in good faith, in a manner he reasonably

believes to be in the best interests of the corporation.'"  *Radol*, 772 F.2d at 256 (quoting Ohio

Rev. Code § 1701.59(B)).

The Ohio Revised Code sets a high bar for plaintiffs asserting breach of fiduciary duty

claims against fiduciaries of an Ohio corporation:

> A director shall not be found to have violated the director's duties . . . **unless it is
> proved by clear and convincing evidence** that the director has not acted in good
> faith, in a manner the director reasonably believes to be in or not opposed to the
> best interests of the corporation, or with the care that an ordinarily prudent person
> in a like position would use under similar circumstances . . . .
>
>                  \* \* \*
>
> A director shall be liable in damages for any action that the directors takes or fails
> to take as a director **only if it is proved by clear and convincing evidence** in a
> court of competent jurisdiction that the director's action or failure to act involved
> an act or omission **undertaken with deliberate intent to cause injury to the
> corporation or undertaken with reckless disregard for the best interests of the
> corporation**.

---

[10] Under the internal affairs doctrine, the law of the state of incorporation governs the
internal affairs of a corporation.  *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); *In re
Fedders*, 405 B.R. at 538–39.  Because Standard Register is an Ohio corporation (Ex. 6, August
1, 2013 Form 8-K at 2), Ohio law—the law of the company's state of incorporation—applies.
Where Ohio and Delaware law are the same, "Ohio courts routinely look to Delaware case law
for guidance in deciding corporate law issues generally." *In re Keithley Instruments, Inc.*, 599 F.
Supp. 2d 908, 918, n. 6 (N.D. Ohio 2009).

Ohio Rev. Code § 1701.59(D)(1), (E) (emphasis added).[11]

The Ohio Revised Code also expressly insulates Ohio directors from liability for breach of fiduciary duty where the directors, in making decisions, rely on information prepared by management, other directors, and outside experts, accountants, or consultants:

> In performing a director's duties, a director is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, that are prepared or presented by . . . directors, officers, or employees of the corporation who the director reasonably believes are reliable and competent in the matters prepared or presented; . . . [c]ounsel, public accountants, or other persons as to matters that the director reasonably believes are within the person's professional or expert competence; [and], [a] committee of the directors upon which the director does not serve . . . as to matters within its designated authority, which committee the director reasonably believes to merit confidence.

Ohio Rev. Code § 1701.59(C).    Thus, to avoid dismissal of the fiduciary-duty claim, the Amended Complaint must plead sufficient facts to show that the directors "ha[d] knowledge concerning the matter in question that would cause reliance on information, opinions, reports, or statements . . . to be unwarranted."  Ohio Rev. Code § 1701.59(D)(2); *see also Goodyear*, 2007 WL 43557, at * 9.

In addition to the strong statutory protections afforded fiduciaries under the Ohio Revised Code, directors and officers of an Ohio corporation also are afforded the robust protections of the common-law business judgment rule.  *See, e.g.*, Baldwin's Oh. Prac. Bus. Org. § 28:25 (2014 ed.) ("Even though RC 1701.59 sets forth standards of care for directors and officers, the courts continue to apply the business judgment doctrine."); *Cullen v. Milligan*, No. 89AP-396, 1990 WL 85133, at *12 (Ohio Ct. App. June 21, 1990) (rejecting argument that the defendant was "not entitled to the protection of this 'business judgment rule' as an officer of the corporation"), *aff'd*

---

[11] "In 1986, Ohio's General Assembly enacted amendments to R.C. 1701.59 and 1701.60 in order to significantly increase the protection afforded to corporate directors." *Stepak v. Schey*, 51 Ohio St. 3d 8, 13 (1990).

*and remanded*, 61 Ohio St. 3d 352 (1991); *Goodyear*, 2007 WL 43557, at *9 (including officers within the scope of Ohio Revised Code Section 1701.59(D)).

Ohio's business judgment rule creates a presumption "that any action taken by a director on behalf of the corporation is taken in good faith and for the benefit of the corporation." *Brosz v. Fishman*, No. 1:13-cv-753, 2015 WL 1782579, at *4 (S.D. Ohio Apr. 14, 2015); *see also Monday v. Meyer*, No. 1:10–cv–1838, 2011 WL 5974664, at *3 (N.D. Ohio Nov. 29, 2011); *Gries Sports Enters., Inc. v. Cleveland Browns Football Co.*, 26 Ohio St. 3d 15, 20 (1986). In light of this presumption, directors and officers cannot be held liable for breach of fiduciary duty under Ohio law if their actions "'***can be attributed to any rational business purpose*.'**" *Goodyear*, 2007 WL 43557, at *10 (emphasis added) (quoting *Koos v. Cent. Ohio Cellular*, 94 Ohio App. 3d 579, 590 (Ohio Ct. App. 1994)). As the United States Court of Appeals for the Sixth Circuit has held:

> Ohio courts adhere to the "business judgment" rule, and ***will not inquire into the wisdom of actions taken by the directors*** in the absence of fraud, bad faith or abuse of discretion . . . . The business judgment rule recognizes that many important corporate decisions are made under conditions of uncertainty, and ***it prevents courts from imposing liability on the basis of ex post judicial hindsight***.

*Radol*, 772 F.2d at 256–57 (citation omitted) (emphasis added). Likewise, as this Court recently concluded, the conduct of fiduciaries cannot be "'judged by hindsight . . . [but] must stand or fall based on what the[ ] [corporate fiduciaries] knew and did at the time.'" *In re Ultimate Escapes Holdings, LLC (Gavin v. Tousignant)*, Nos. 10-12915 (BLS), Adv. 12-50849 (BLS), 2015 WL 1590132, at *7 (Bankr. D. Del. Feb. 5, 2015) (alterations in original) (quoting *Chen v. Howard-Anderson*, 87 A.3d 648, 665 (Del. Ch. 2014)). Only in "extraordinary circumstances" may a court "substitute its business judgment for that of directors." *Louisiana Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1176 (Del. Ch. 2007).

Because the presumption in favor of directors and officers is so strong, the Committee bears the burden of rebutting the presumption with well-pleaded factual allegations in the Amended Complaint. *See, e.g.*, *NCS Healthcare, Inc. v. Candlewood Partners, LLC*, 160 Ohio App. 3d 421, 428–29 (Ohio Ct. App. 2005). "Plaintiffs must plead facts, as distinct from generalized conclusions, which, if proved, would overcome the presumption that [the directors] have acted in good faith and in the best interests of the corporation." *In re Gas Natural, Inc.*, No. 1:13 CV 02805, 2015 WL 3557207, at *15 (N.D. Ohio June 4, 2015). In other words, the Amended Complaint's unsupported assertions are not enough. To overcome the business judgment rule and state a claim for breach of fiduciary duty, the Committee must plead ***facts*** sufficient to show that the defendants "acted with 'deliberate intent' or 'reckless disregard'" for the best interests of the corporation. *Goodyear*, 2007 WL 43557, at * 9.

Where, as here, a plaintiff fails to allege facts sufficient to rebut the presumption of the business judgment rule, courts in Ohio and Delaware routinely dismiss claims for breach of fiduciary duty. *See, e.g.*, *NCS Healthcare,* 160 Ohio App. 3d at 428 (affirming dismissal of claims for breach of fiduciary duty and noting that the business judgment rule presumes "that directors are better equipped than the courts to make business judgments and that the directors acted without self-dealing or personal interest and exercised reasonable diligence and acted with good faith"). Here, that the Committee had the benefit of discovery, including Board minutes and expert analyses, when drafting the Amended Complaint underscores the deficiency of the Amended Complaint's allegations. This is not a case where the plaintiff lacked access to any documents that might support its claims. Yet the Amended Complaint still pleads "no facts, as distinct from generalized conclusions, which if proved would overcome the presumption of good

20

faith and satisfy the requirements of R.C. 1701.59(D)" and must, therefore, be dismissed. *Abrahamson v. Waddell*, 63 Ohio Misc. 2d 270, 273 (Ohio C.C.P. 1992).

### B. The Amended Complaint Alleges No Facts that Would Overcome the Business Judgment Rule and Establish a Breach of the Duty of Care.

The Amended Complaint's duty-of-care claim is based on the implausible theory that the defendants "knew or should have known" that the projections presented at the Board meetings in connection with the WorkflowOne acquisition were "unrealistic and overly optimistic." (¶¶ 111, ████.)

But the Amended Complaint fails to allege any facts, as opposed to mere generalized conclusions, to demonstrate that the projections were "unrealistic and overly optimistic" or that Standard Register's officers or directors knew or should have known this. Naked assertions that a fiduciary "should have" known something are insufficient to create an inference that a director had a culpable state of mind. *See Raul v. Rynd*, 929 F. Supp. 2d 333, 348 (D. Del. 2013) (dismissing complaint); *accord Goodyear*, 2007 WL 43557, at *9 (granting motion to dismiss Ohio breach of fiduciary duty claim where plaintiffs pleaded that the defendants "as a group, knew or should have known of the inaccuracy of the statements about which the plaintiffs complain"). Instead, the Amended Complaint must (but does not) allege "that the Board relied upon 'what it *knew* was an inaccurate analysis.'" *Miramar Firefighters Pension Fund v. AboveNet, Inc.*, No. 7376-VCN, 2013 WL 4033905, at *5 (Del. Ch. July 31, 2013) (emphasis added) (granting motion to dismiss and finding that "the assumptions and projections [allegedly] utilized by J.P. Morgan and Moelis were not so irrational that the Board had to have known their analyses were flawed"); *accord In re Celera Corp. S'holder Litig.*, No. 6304-VCP, 2012 WL 1020471, at *25 (Del. Ch. Mar. 23, 2012) ("Credit Suisse's errors were neither conspicuous nor significant" and therefore plaintiffs could not show that the board acted in bad faith by relying on

21

what it knew was an inaccurate analysis), *aff'd in part, rev'd in part*, 59 A.3d 418 (Del. 2012). Here, because the Amended Complaint alleges no specific material error in the methodology used to generate the projections—let alone that any of Standard Register's officers or directors was aware of any shortcoming—the Amended Complaint fails to sufficiently allege a breach of the duty of care.  *See, e.g.*, *Miramar Firefighters*, 2013 WL 4033905 at *6 ("[Plaintiff] has not explained adequately [in its Complaint] why any of the inputs used [in the financial projections] were *per se* unreasonable.").

The Amended Complaint also fails to allege other facts that could support a duty-of-care claim.  It does not allege that Standard Register's officers or directors were unfamiliar with Standard Register's business and financial performance, its financial planning and budgeting process, or the print industry as a whole; or that any of the directors were not present at, or were not engaged in, any of the numerous Board meetings regarding the WorkflowOne acquisition. The Amended Complaint does not allege that BAML, Capstone or Gibson Dunn were unqualified to provide advice to the Board such that the directors' reliance on their advice was unwarranted, nor does it allege any facts as to why ███████████████████████ ████████████████████████████████████████) should be credited at all, let alone credited more than the projections prepared by the officers and professionals analyzing this specific deal between these specific companies. *Cf. Miramar Firefighters*, 2013 WL 4033905, at *4 (finding that allegations regarding outside analyst commentary were insufficient to establish a breach of the duty of loyalty and overcome the business judgment rule).[12]

---

[12]  The First Count of the Complaint does not expressly allege any problems with the defendants' valuation of WorkflowOne or the structure of the deal.  Rather, to the extent the purchase price and deal structure are at issue, it appears that the Committee is alleging that the ████████████████████████████████  Even assuming these allegations form separate

22

Given these pleading deficiencies, the Amended Complaint fails to allege sufficient facts to plausibly establish that the defendants' preparation of or reliance on the projections presented in connection with the WorkflowOne acquisition amounted to "reckless disregard" for Standard Register's best interests, much less "deliberate intent" to cause injury to Standard Register. Ohio Rev. Code § 1701.59(E). Under Ohio law, "[r]eckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 134 Ohio St. 3d 380, 388 (2012). As discussed above, the Amended Complaint pleads no facts that would show that reliance on the projections was flawed or presented an "unreasonable" or "known or obvious risk of harm" to Standard Register.

At bottom, the Committee's allegations that the projections were "unrealistic and overly optimistic" are the product of nothing more than hindsight bias—the type of bias that the business judgment rule is specifically designed to prevent. *See Radol*, 772 F.2d at 257. Accordingly, the First Count should be dismissed.

### C. The Amended Complaint Pleads No Facts that Would Overcome the Business Judgment Rule and Establish a Breach of the Duty of Loyalty.

The Amended Complaint's duty-of-loyalty claim should also be dismissed. The Amended Complaint asserts that the Board and management allegedly sought to preserve their "positions of control"—to entrench themselves—and that Morgan and Ginnan were supposedly

---

bases for the duty-of-care claim, they share similar flaws as the allegations regarding the projections. As discussed above, the Complaint alleges no facts from which it can be inferred that █████████████████████████████████████████████████████████████

23

improperly motivated by transaction bonuses.  (¶ 115.)[13]  Both theories are implausible and fail

to state a claim for the breach of the duty of loyalty.

### 1.    The Amended Complaint Pleads No Facts to Plausibly Establish Entrenchment.

"A successful claim of entrenchment requires plaintiffs to prove that the defendant

directors engaged in action which had the effect of protecting their tenure and that the action was

motivated *primarily or solely* for the purpose of achieving that [entrenchment] effect."  *Benihana*

*of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 186 (Del. Ch. 2005), *aff'd*, 906 A.2d 114 (Del.

2006) (emphasis in original).   Here, however, the Amended Complaint alleges no facts that

would establish that the Board or management chose the WorkflowOne acquisition over an

alternative option that, if chosen instead, would have resulted in their losing their positions at

Standard Register.  *See, e.g.*, *Bodkin v. Mercantile Stores Co.*, No. 13770, 1996 WL 652763, at

*3 (Del. Ch. Nov. 1, 1996) (dismissing complaint; "without an allegation that the offer posed an

actual threat to their continued employment as directors, . . . I cannot find that plaintiffs have

raised a reasonable doubt that the directors are disinterested in the transaction and not influenced

by entrenchment motives").   Importantly, the Amended Complaint does not allege that Standard

Register's management or directors *rejected* an offer to be acquired that would have resulted in

the loss of their positions of control.   Rather, the Amended Complaint alleges only that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮   This artful pleading is significant, because it reflects that the Committee,

which had full access to Standard Register's Board meeting minutes for months before filing the

---

[13]   While the Committee has phrased in the conjunctive that directors and officers were
not disinterested because of "maintenance of their positions of control *and* the receipt of
significant transaction bonuses and other incentive compensation" (¶ 115) (emphasis added), the
Committee has not alleged—nor could the Committee allege—that the directors received any
transaction bonus or other incentive compensation.

Amended Complaint, knows that no offer to be acquired was ever made—and, therefore, that no offer was ever rejected—in 2012 and 2013. (*See* ECF No. 529-2 at 36, 40 of 43 (fee application time entries for review of 2012 and 2013 Board meeting minutes and materials).)

Thus, the Amended Complaint fails to plead that the defendants were faced with two alternatives—one of which would not protect their tenure (for example, a sale) and one of which would supposedly entrench them (for example, an acquisition).  With no offer to be acquired alleged to have even been made, let alone rejected, the Amended Complaint fails to allege any facts from which it can be plausibly inferred that Standard Register's officers or directors supported or approved the WorkflowOne acquisition in order to maintain their positions of control.  The Amended Complaint's assertion to the contrary, therefore, is nothing more than a naked and implausible conclusion, and the entrenchment claim must be dismissed. *See, e.g.*, *In re Fedders*, 405 B.R. at 542 ("simple allegations of such 'entrenchment motives,' without more, are insufficient to state a claim that directors are financially interested" in a transaction).[14]

## 2.    The Amended Complaint Pleads No Facts to Plausibly Demonstrate Disloyal Conduct.

The Amended Complaint alleges that Morgan and Ginnan elevated their own interests above those of the company supposedly to obtain certain compensation payments in connection with the transaction.  (¶¶ 51–52.)  The Amended Complaint asserts that ████████████

---

[14] The Committee suggests that the directors and management were also motivated by a desire to preserve their equity interests in Standard Register.  (*See* ¶ 51 ("[T]he Board and the Director and Officer Defendants ensured that Standard Register's senior management and the Board . . . would remain in place and retain their equity holdings . . . ."))  This allegation is not repeated in the First Count, but, assuming arguendo that it is intended to support the disloyalty argument, it also fails.  First, as discussed above, there is no allegation that Standard Register ever rejected an offer that would have resulted in the defendants losing their equity interests.  Second, by preserving their equity interests, the defendants were in the same position as all other shareholders.  *See Koos*, 94 Ohio App. 3d at 590.  Indeed, the defendants' interests in having the WorkflowOne Acquisition succeed were perfectly aligned with all other shareholders—if it failed, they, too, stood to lose their equity interests.

███████████████████████████████████████████████████████

████████████████████████████████    Those allegations fail for several reasons.  First, they turn

the business judgment rule on its head.  Neither the law nor this Court presumes that fiduciaries

act in their own self-interest.  The opposite is true.  (*See supra* Argument Section III.A.)  Second,

allegations that a fiduciary "should have" known something are insufficient to create an

inference that the fiduciary had a culpable state of mind.  *See, e.g.*, *Raul*, 929 F. Supp. 2d at 348

(dismissing complaint).  Third, both "'judicial experience and common sense'" confirm that the

Amended Complaint's allegations fall well short of those needed to state a plausible claim.  *See*

*In re Vertis Holdings (Riverside Acquisition Grp. v. Vertis Holdings, Inc.*), 536 B.R. 589, 617

(Bankr. D. Del. Sept. 11, 2015) (quoting *In re Digital, Inc.,*443 B.R. 22, 34 (Bankr. D. Del.

2011)).  At bottom, the Amended Complaint alleges that, to obtain a comparatively small

transaction bonus, Morgan and Ginnan proffered projections in pursuit of a transaction that they

knew (or "should have known") would bankrupt the company, destroy the value of their

substantial shareholdings in the company, result in forfeiture of significant retirement plans and

potentially eliminate their jobs and their livelihoods.  But that theory is completely implausible.

Indeed, the Amended Complaint itself acknowledges that half of the transaction bonus was

contingent on achievement of certain post-acquisition performance-based metrics, which were

achieved and thus aligned Morgan and Ginnan's interests with those of the combined company's

shareholders.  (*See* ¶ 105.)

Both Morgan and Ginnan owned a significant number of shares of the company's stock.

As other courts have recognized, and as common sense would dictate, the equity holdings of

officers or other fiduciaries align their interests with those of the corporation's shareholders.

*See, e.g.*, *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1005 (Del. Ch. 2005) ("[T]he

ny-1207575

fact that [the CEO] was so heavily invested in the Company's equity no doubt encouraged him to take value-maximizing steps without regard for his future employment because he recognized that a good deal for Toys "R" Us stockholders would leave him very wealthy, too.").

On July 31, 2013, in addition to the cash bonuses, the Board approved certain equity grants in connection with the closing of the WorkflowOne transaction. (Ex. 6, August 1, 2013 Form 8-K at 9.)[15]  The time-vested restricted stock would fully vest in 2016 and the performance-related restricted stock would vest "based on the achievement of certain performance goals over three years." (*Id.* at 9-10.) In other words, the equity component of the transaction bonus even further aligned the interests of Morgan and Ginnan with the long-term performance of the company.

Those grants were on top of significant personally held ownership stakes. As of January 31, 2014, Ginnan owned 44,728 shares (excluding options) and Morgan owned 166,387. (Ex. 7, March 14, 2014 DEF 14A at 8, 9 n.4 (listing Morgan's and Ginnan's shares and options) (referenced at ¶¶ 54–55 (discussing 2012–2013 compensation).) On August 1, 2013, when the Company acquired WorkflowOne, those shares were worth $13.80 apiece, meaning that their equity holdings far exceeded the transaction-related cash bonuses they received. Likewise, both Morgan and Ginnan had earned significant amounts under the company's supplemental retirement plan through 2013—nearly $500,000 and nearly $200,000, respectively. (Ex. 7, March 14, 2014 DEF 14A at 29 (listing $162,067 and $79,196, respectively); Ex. 8, March 21, 2013 DEF 14A at 22 (listing $134,716 and $67,146, respectively) (referenced at ¶¶ 54–55 (discussing 2012-2013 compensation)); Ex. 9, March 16, 2011 DEF 14A at 16 (listing $90,000

---

[15] Those equity grants consisted of 91,000 shares of performance-related restricted stock to Morgan and 24,500 shares to Ginnan, and 39,000 shares of time-vested restricted stock to Morgan and 10,500 shares to Ginnan. (Ex. 6, August 1, 2013 Form 8-K at 9.)

and 109,846 for Morgan, and $45,000 for Ginnan).)   Nevertheless, the Amended Complaint's implausible theory is that Morgan and Ginnan acted disloyally and in their own financial self-interest, risking millions of dollars in equity and cash for half of a one-time bonus that was a mere fraction of the value of their stockholdings.[16]

The Amended Complaint's other allegations also fail to plausibly establish any disloyal motivation.   The Amended Complaint simply compares the 2013 compensation packages of Morgan and Ginnan to those of a competitor (¶ 107) and to their 2012 compensation packages. (¶¶ 54–55.)   Those allegations are nothing more than a thinly disguised attempt to assert an executive compensation claim, but the Amended Complaint alleges no substantive challenge to the Board's decision approving the compensation packages.   And, even if the Amended Complaint's allegations could be construed as a back-door attack on the Board's compensation decisions, "a board's decision on executive compensation is entitled to great deference," and "the size and structure of executive compensation are inherently matters of judgment."  *Freedman v. Redstone*, 753 F.3d 416, 428 (3d Cir. 2014) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000); affirming dismissal).

## IV.    The Breach of Fiduciary Duty Claim (First Count) Should Be Dismissed Because the Amended Complaint Alleges No Facts that Would Support a Finding of Proximate Cause.

In addition to failing to plead facts to rebut the business judgment rule, the First Count should be dismissed for the separate reason that the Amended Complaint fails to allege facts that

---

[16] By way of illustration: at $13.80 per share, Ginnan's shares (excluding options) as of January 31, 2014 were worth nearly $625,000 and Morgan's were worth nearly $2.3 million. (Ex. 7, March 14, 2014 DEF 14A at 8 (referenced at ¶¶ 54–55).)  The portion of Ginnan's bonus tied to the consummation of the transaction was $162,500 and Morgan's was $450,000.  (Ex. 7, March 14, 2014 DEF 14A at 28.)   In other words, the Amended Complaint alleges that Morgan and Ginnan risked their significant equity in the company for bonuses that were mere *fractions of their equity stake*, approximately one-quarter and two-tenths, respectively.

would support a plausible finding of proximate cause, which is an essential element of a breach of fiduciary duty claim.

Courts in Ohio have made clear that "if a plaintiff establishes that a defendant breached his fiduciary duty, the plaintiff must then establish that the breach proximately caused his damages." *Kademian v. Marger*, 2014-Ohio-4408 (Ohio Ct. App. Oct. 3, 2014); *Brautigam*, 2012 WL 481844, at *7 (noting that, under Ohio law, plaintiff asserting breach of fiduciary duty claim must show "injur[ies] proximately resulting therefrom" the alleged breach).   Here, the Amended Complaint alleges no facts that would establish that Standard Register's bankruptcy, and any damages resulting therefrom, was caused by the defendants' supposed failure to exercise their duties of care or loyalty in connection with the WorkflowOne acquisition, rather than by market forces.

The Amended Complaint attempts to pin the company's ultimate insolvency on the WorkflowOne transaction.   But the Amended Complaint itself alleges that the traditional print industry and Standard Register's financial condition were in decline and that Standard Register's pension problems had begun long before the WorkflowOne Acquisition.   The Amended Complaint also ignores that revenues actually increased after the acquisition.   (*See* Ex. 10, February 21, 2014 Form 8-K at Ex. 99.1 at 1 (reporting increase in full-year and fourth quarter revenue "due in large part to acquisition of WorkflowOne," and further reporting that 2013 full-year revenue was $719.8 million, compared with $602 million for 2012, and fourth quarter revenue was $242 million, "an increase of 69 percent from the fourth quarter of 2012").)   And although the Committee asserts its claims with the benefit of hindsight, the Amended Complaint ignores the market's overwhelmingly positive reaction to the acquisition:   on the day it was

29

announced, the stock price of Standard Register increased by 360% and remained above the pre-acquisition price for nearly a year. (*See supra* Background Section IV.)

To the extent the Amended Complaint asserts that the transaction bonuses were waste and dissipation of assets that caused the Standard Register bankruptcy, that theory of proximate causation fails as a matter of law. There are no facts alleged in the Amended Complaint—nor could there be, as the Committee is aware from its pre-complaint discovery—showing that payment of the bonuses caused the Standard Register bankruptcy. If anything, as noted above, the bonuses incentivized Ginnan and Morgan to maximize shareholder value and were paid out only after the combined company met certain benchmarks in the first quarter of 2014. (*See supra* Argument Section III.C.2.)

In short, the Committee's hindsight attempt to attribute damages to the WorkflowOne acquisition, and any alleged breaches of fiduciary duty in connection with the Acquisition, is implausible. Plaintiffs' claims for breach of fiduciary duty should be dismissed.

**V.    The Claim for Punitive Damages (First Count) Should Be Dismissed Because the Amended Complaint Fails to Allege Any Facts that Would Establish Malice.**

The Amended Complaint's demand for punitive damages should be dismissed because it alleges neither malice nor pleads any facts that would support malice. Under Ohio law, punitive damages may be awarded for a breach of fiduciary duty only where there is a demonstration of "actual malice." *See, e.g.*, *McConnell v. Bare Label Prods., Inc.*, 2015-Ohio-1206, ¶ 49 (Ohio Ct. App. Mar. 31, 2015). Actual malice is defined as: "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 336 (1987). The level of conduct that must be alleged "is reflected in the use of such terms as 'outrageous,' 'flagrant,' and 'criminal.'"

30

*Id.* at 335–36.   Here, the Amended Complaint alleges nothing approaching that.   There are no allegations of "hatred" or "ill will" or "revenge."   Nor are there any factual allegations demonstrating that the defendants intentionally disregarded their fiduciary duties.   (*See supra* Background Section III.)   At most, the Amended Complaint alleges that the defendants failed to accurately predict the future with certainty, which is true of every other business decision made in the "real world."   *Accord In re Fedders*, 405 B.R. at 541 ("[B]usiness failure is an ever-present risk.   The mere fact that a strategy turned out poorly is in itself insufficient to create an inference that the officers and directors who oversaw the strategy breached their fiduciar[y] duties.").[17]

## VI.   The Claims Against Morgan and Ginnan for Fraudulent Transfer (Second and Third Counts) Should Be Dismissed.

### A.   The Claim for Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(B) Should Be Dismissed.

The Committee's claim for constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) should be dismissed.[18]   This claim is based on the transaction bonuses paid to Morgan and Ginnan—$900,000 and $325,000, respectively—in connection with the WorkflowOne acquisition, half of which were payable only after the combined company met several financial benchmarks. (¶¶ 54–55.)

---

[17] In addition, because the Amended Complaint fails to plead a plausible claim for breach of fiduciary duty (*see supra* Argument Section III) for which compensatory damages could be awarded, the demand for punitive damages must also be dismissed. *See, e.g.*, *Miller v. Keybank Nat'l Ass'n*, 2006-Ohio-1725, ¶ 50 (Ohio Ct. App. April 6, 2006) ("In order for a plaintiff to be entitled to punitive damages, there must be proof of an underlying independent compensatory damage claim.") (affirming rejection of punitive damages claim).

[18] That the Committee does not assert claims under 11 U.S.C. § 548(a)(1)(A), which requires a showing of actual fraudulent intent, effectively concedes that the Amended Complaint alleges no intentional misconduct relating to the receipt of the bonuses by Morgan and Ginnan.

31

To survive a motion to dismiss, "the Trustee cannot merely recite the statutory elements" of a constructive fraudulent transfer claim. *In re Circle Y (Burtch v. Dent)*, 354 B.R. 349, 356 (Bankr. D. Del. Nov. 21, 2006) (dismissing fraudulent transfer claim brought under Section 548(a)(1)(B) where, as here, Committee simply "recites general, conclusory allegations that almost completely parrot the statutory language"); *see also In re Global Link (Global Link v, Avantel)*, 327 B.R. 711, 718 (Bankr. D. Del. 2005) (dismissing fraudulent transfer claim where complaint parroted statutory language and "present[ed] no information on the Debtors' financial status or the value of what was received in exchange"). Rather, bankruptcy courts in this District typically require a complaint to plead two elements, both of which must be "facially plausible in order to survive a motion to dismiss for constructive fraudulent transfer: (i) the debtor's insolvency and (ii) whether the debtor received reasonably equivalent value for the transfer." *In re Aphton Corp. (Walker v. Sonafi Pasteur)*, 423 B.R. 76, 90 (Bankr. D. Del. 2010). Here, the Amended Complaint merely recites the statutory elements of a fraudulent transfer claim without alleging any facts in support of the theory, and the Committee's claim for constructive fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B) should accordingly be dismissed.

### 1. The "Transaction Bonuses" Were a Pre-Existing Debt and Thus Cannot Support a Claim for Constructive Fraudulent Transfer.

Hornbook bankruptcy law, which provides that payment to extinguish a debt or obligation is reasonably equivalent value, requires dismissal of the transfer claim. "Value" is defined in section 548(d)(2)(A) of the Bankruptcy Code in pertinent part as "satisfaction or securing of a present or antecedent debt of the debtor." "Payment of a pre-existing debt is value, and if the payment is dollar-for-dollar, full value is given." Collier on Bankruptcy ¶ 548.03[5] (16th ed. 2015). Here, the bonuses were a pre-existing debt of the company: the Board's approval of the bonuses for Ginnan and Morgan created a payment obligation of the company

32

upon satisfaction of certain conditions (namely, the closing of the acquisition and the achievement of certain performance-based metrics). (Ex. 6, August 1, 2013 Form 8-K at 9–10.) When each of those conditions was met—a point the Amended Complaint does not dispute— Morgan and Ginnan became entitled to the bonuses. Payment of the bonuses thus satisfied an antecedent debt of the company on a dollar-for-dollar basis. If the Committee wanted to challenge the bonuses, it would need to challenge the Board's approval of them, but it has not done so. (*See supra* Argument Section III.C.2 (citing *Freedman*, 753 F.3d at 428).)

Even aside from that dispositive point, the constructive fraudulent transfer claim still fails. In lieu of any factual allegations showing that the Debtors did not receive reasonably equivalent value in exchange for the transaction bonuses, the Committee offers only a conclusory theory that, because the WorkflowOne acquisition was ultimately unsuccessful, the transaction bonuses somehow "must" have been fraudulent. But courts in Delaware reject such arguments and routinely dismiss claims for constructive fraudulent transfer based on formulaic, hindsight-based allegations. *See, e.g.*, *In re Midway Games (Official Comm. of Unsecured Creditors of Midway Games Inc. v. Nat'l Amusements Inc.)*, 428 B.R. 303, 325 (Bankr. D. Del. 2010) (dismissing claim where plaintiff failed to plead cognizable facts sufficient to show, *inter alia*, that the transfer "resulted in no value" for the Debtor or that the "value received was not 'reasonably equivalent' to the relinquished property"); *In re Fedders*, 405 B.R. at 547 ("Taking all facts in the complaint as true and granting all reasonable inferences to [p]laintiff, the Court cannot conclude that the complaint successfully pleads that Fedders received less than 'reasonably equivalent value' from the Lenders . . . .") (dismissing constructive fraudulent transfer claim). This Court should do the same.

33

**2.      The Allegations that the Company Was Insolvent at the Time of the Acquisition Are Implausible.**

The Committee's fraudulent transfer claim should be dismissed for the separate and independent reason that the Amended Complaint fails to plausibly allege that the company was insolvent at the time the transaction bonuses were paid.  The first half of the bonuses was paid upon the closing of the acquisition, and the second half was paid after the company met certain financial benchmarks, in the first quarter of 2014—i.e., more than one year before the company filed for bankruptcy.  The Amended Complaint alleges in conclusory fashion that the "Debtors were left insolvent as a result of the WorkflowOne Acquisition" (¶ 87), but fails to plead any facts in support of this implausible allegation.  The Amended Complaint lacks any allegations that, for example, the company could not or did not pay its creditors when the transaction bonuses were paid.  Without such factual allegations, the Amended Complaint fails to plead insolvency.  *See, e.g.*, *In re Crucible Materials Corp. (Gellert v. Coltec Indus.)*, Nos. 09-11582 (MFW), Adv. No. 11-53884 (MFW), 2012 WL 5360945, at *7 (Bankr. D. Del. Oct. 31, 2012) (dismissing fraudulent transfer claim where complaint lacked "actual facts to support [] contention that Crucible was insolvent at the time the payments were made").

Notably, the Amended Complaint implicitly concedes that the company's insolvency was not even on the horizon until months after the acquisition.  ███████   And the fact that the company's stock price jumped approximately 360% when the acquisition was announced plainly shows that the company was not insolvent at the time.  *See, e.g.*, *In re Iridium Operating LLC (Statutory Comm. of Unsecured Creditors on behalf of Iridium Operating LLC v. Motorola, Inc.)*, 373 B.R. 283, 292–93 (Bankr. S.D.N.Y. 2007) (dismissing claim for fraudulent transfer where "contemporaneous market data for Iridium's publicly traded securities" was "inconsistent

34

with insolvency.  The market evidence is simply too voluminous and compelling to reach any other conclusion.").

Furthermore, the day before it approved the WorkflowOne transaction, the Board obtained a final solvency opinion from Capstone Valuation Services.  (*See* ECF No. 586-4.) This opinion concluded ███████████████████████████████████████████ ████████████████████████████.  It is entirely implausible to suggest, as the Committee does, that the Board would have approved the WorkflowOne acquisition, and the transaction bonuses, if the Board believed or knew that insolvency would immediately result.

Here, the Amended Complaint's naked assertion that "the company was insolvent" at the time the transaction bonuses were paid is unsupported by any well-pled factual allegations.  The fraudulent transfer claim should be dismissed.

### 3.    The Amended Complaint Fails to Allege Any Other Basis for the Constructive Fraudulent Transfer Claim.

Finally, the Committee fails to allege any other plausible basis for asserting a fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(B).  Even if the Amended Complaint demonstrated that the company did not receive reasonably equivalent value in exchange for the transaction bonuses (and it has not), the Amended Complaint still fails to plead facts showing either that (i) "the debtor . . . intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as such debts matured," or (ii) "the debtor . . . was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was unreasonably small capital."  11 U.S.C. § 548 (a)(1)(B)(ii)(11), (111).  Instead of pleading facts, the Amended Complaint simply parrots the language of the statute in an attempt to state a claim for relief.  (*E.g.*, ¶¶ 119–24.)  The Amended Complaint pleads no facts to show, for example, that the company or any of the defendants believed that the

35

transaction bonuses would have caused the debtor to incur debts beyond the company's ability to pay.   To the contrary, the transaction bonuses were approved by an independent compensation committee and—at no more than $1.225 million, total—the bonuses (even if fully paid) constituted only a small amount as compared to the company's overall assets and liabilities.   No facts in the Amended Complaint show that these payments jeopardized the company's ability to pay its debts.   Similarly, there are no facts in the Amended Complaint to show that the company's capital was unreasonably small after payment of the transaction bonuses.   While the Committee argues that the $218 million acquisition itself contributed to the Debtor's ultimate insolvency, there are no allegations in the Amended Complaint showing that the transaction bonuses—which, again, totaled less than $1.225 million—left the Company with unreasonably small capital.

> **B.    The Amended Complaint's Claim for Fraudulent Transfer Under the Ohio Uniform Fraudulent Transfer Act Should Be Dismissed for Similar Reasons.**

The Committee's claim for alleged fraudulent transfer under the Ohio Uniform Fraudulent Transfer Act ("UFTA"), codified at Ohio Revised Code Section 1336.04, should likewise be dismissed.   As with its claims brought under 11 U.S.C. § 548(a)(1)(B), the Committee does not contend that defendants acted with actual fraudulent intent, asserting only a claim for constructive fraudulent transfer under Ohio Revised Code Section 1336.04(A)(2).

Courts in Ohio have noted that constructive fraudulent transfer claims brought under the UFTA are essentially identical to those brought under 11 U.S.C. § 548.   *E.g.*, *In re Gavin (Rhiel v. Mortg. Elec. Registration Sys.)*, Nos. 08-60881, Adv. Proc. 09-2059, 2011 Bankr. LEXIS 2613, at *8 (Bankr. S.D. Ohio July 11, 2011) ("The constructive fraudulent transfer provisions of section 548 and the Ohio UFTA are nearly identical in that each requires a finding that (1) the debtor did not receive reasonably equivalent value in exchange for the transfer, and (2) the

36

debtor meets some form of insolvency test."); *In re Grove-Merritt (Slone v. Lassiter)*, 406 B.R. 778, 805 (Bankr. S.D. Ohio June 2, 2009) (noting that only practical difference is the look-back period—four years under Ohio law and two years under the bankruptcy code).  Accordingly, the UFTA claim should be dismissed for the same reasons as the Section 548 claim.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice. Given the Amended Complaint's extensive deficienies, and in light of the exhaustive discovery the Committee has received and the opportunity to amend that it has already enjoyed, leave to replead should be denied as futile.

*[Signature follows]*

Dated:    October 16, 2015
            Wilmington, DE

*/s/ Matthew B. Harvey*

**MORRIS, NICHOLS, ARSHT &
TUNNELL LLP**
Robert J. Dehney (No. 3578)
David J. Teklits (No. 3221)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: (302) 658-9200
Fax: (302) 658-3989

*Counsel for Defendants*


**MORRISON & FOERSTER LLP**
James Michael Peck*
Carl H. Loewenson, Jr.*
Robert J. Baehr*
250 West 55th Street
New York, New York 10019
Tel: (212) 468-8000
Fax: (212) 468-7900

James M. Koukios*
Lauren A. Navarro*
2000 Pennsylvania Avenue NW, Suite 6000
Washington, D.C. 20006
Tel. (202) 887-1500

*Counsel for Roy W Begley, Jr., F. David
Clarke, III, John Q. Sherman, II, Julie D.
Klapstein, John J. Schiff, Jr., and R. Eric
McCarthey*

**JONES DAY**
Jeffrey J. Jones*
Charles M. Oellermann*
Marjorie P. Duffy*
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215
Tel: (614) 469-3939
Fax: (614) 461-4198

*Counsel for Robert M. Ginnan*


**SQUIRE PATTON BOGGS (US) LLP**
Joseph C. Weinstein*
Sean L. McGrane*
4900 Key Tower
127 Public Square
Cleveland, OH 44114
Tel: (216) 479-8500
Fax: (216) 479-8780

*Counsel for Joseph P. Morgan, Jr.*

---

    * *Pro hac* admission pending.